## CAPPS et al. v. CAPPS.

No. 6945. Decided December 30, 1946. (175 P. 2d 470.)

See 65 C. J., Trusts, sec. 78; 54 Am. Jur. 480. Degree or intensity of parol proof necessary to establish a trust, note, 23 A. L. R. 1500.

*Willard Hanson* and *Stewart M. Hanson,* both of Salt Lake City, for appellant.

*A. H. Hougaard,* of Salt Lake City, for respondents.

McDONOUGH, Justice.

Defendant as principal beneficiary under a war risk insurance policy, which became payable by reason of death of the insured, was declared trustee for the benefit of the three minor children of the deceased veteran, and she appeals.

The parents of plaintiff minors were divorced April 9, 1943. Without having the interlocutory decree set aside, they resumed living with each other, until the husband Jacob L. Capps (the insured), was inducted into military service January 25, 1944. Upon entering military service he took out a $10,000 war risk insurance policy, naming as beneficiaries, his divorced wife, Maureen I. Capps, as "principal beneficiary" and his eldest child, John L. Capps, as "contingent beneficiary." On May 4, 1944, the insured executed a change of beneficiary form, while at Camp Wheeler, Georgia. He named his mother, the defendant

Nettie W. Capps, as "principal beneficiary," and his three children as "contingent beneficiaries," with $3,000 payable to each of the two boys and $4,000 to the girl.

The insured thus eliminated his former wife as beneficiary, but he did not terminate the allotment he had provided for her, although he made some ineffective efforts to do so while home on furlough in June 1944. On June 19, 1944, the insured came to the Red Cross chapter office at Bountiful and asked Mrs. Muir, the executive secretary, to give him some assistance and advice. He appeared upset about his former wife, stating that she had been "stepping out on him," that he did not want her to have the allotment any longer, but he wanted his children to have it. He had Mrs. Muir help him make out a "change of status certificate" in which Maureen I. Capps was referred to as his ex-wife. He also told Mrs. Muir who was acquainted with his mother, that he did not want his former wife to have anything to do with the insurance. According to Mrs. Muir's recollection, he stated that he wanted his children to have the benefit of the insurance and that he was making his mother beneficiary to be assured that his children would get the benefit of it; that he wanted the girl to have $4,000, and each of the boys to have $3,000; that he felt his mother would be the one to take care of it for him. He said he would trust his mother, and the

"idea was that his mother was to be trustee, although he didn't use the word 'trustee' "; but "he was very sincere about the fact that he wanted these children taken care of as they grew up and the money was to be for them."

He said it was his children he was interested in, and he was anxious that his mother handle the business for him because she was more capable of doing it, and he did not trust his wife with handling the insurance.

Mrs. Muir subsequently had a conversation at the Red Cross office with the defendant Mrs. Nettie W. Capps. Mrs. Muir testified that she was acquainted with both the father and mother of the insured. On the occasion of the visit of

Mrs. Nettie W. Capps after the insured had left town, Mrs. Muir stated that the conversation with defendant related to the fact that the insured had made out the insurance to his mother in trust for his children. The mother was worried, because

"her whole thought was that the children should have the proper care, * * * and that was the insurance of Jake they should have."

The defendant was in the office when a letter was written concerning the insured. The insured left with Mrs. Muir the copy of the change of beneficiary, dated May 4, 1944, which he asked Mrs. Muir to keep for him.

The insured wrote a letter to his parents dated July 3, 1944, stating that he was in the east coast and leaving soon for overseas. He said,

"If you don't receive my insurance policy within 30 days contact Mrs. Muir. She has the application."

There was no reference in any of his letters to either his parents or to his former wife as to the application of the proceeds.

He wrote to his former wife as well as to his parents, expressing himself in terms of affection. In some letter to his parents he stated that his former wife wanted to remarry him when he returned, and in a letter to his wife he stated that he desired to be remarried to her. He expressed the greatest concern and affection for his children. His former wife did not know of the change of beneficiary until after receiving word of his death. He was killed in action October 13, 1944. His former wife notified the defendant, shortly after receipt of word of his death, and they visited with each other on several occasions thereafter.

It is undisputed that there were conversations between defendant Nettie W. Capps and the former wife of the decedent concerning the change of beneficiary, and that such conversations occurred in November 1944. According to the former wife, Maureen, she did not know of the change of beneficiary until so informed by defendant after the in-

sured was killed. She testified that defendant came down to take the two boys up to her place for a week, and on the occasion mentioned that the insured had changed the insurance, $3,000 to each of the boys and $4,000 to Carolyn, and that defendant had been made beneficiary and trustee and that the money was to be used solely for the support and education of the children. Maureen testified that she said that was all right, because she did not want the money, but did want the children to have it. About a month later, according to the testimony of Maureen, defendant stated that while the insured was home on furlough he told defendant he wanted the money put into a trust fund solely for the education and support of the children, and that she would place the money into a trust fund for the support of the children. Maureen also testified that she informed defendant on several occasions thereafter, that the children were in need and made inquiry about the insurance money; that while defendant informed Maureen prior to receipt of the first payment on the insurance in March 1945 of something over $300 that defendant intended to keep all the insurance money herself, a few days after such initial payment, defendant sent Maureen a check for $100; that after Maureen employed counsel for the children and a letter was sent to defendant requesting that the insurance proceeds be placed in a trust fund, defendant sent Maureen a check for $150; that about May 1945 defendant sent a check for $34.70 which was the exact amount of the insurance check for May 1945; and that on July 25, 1945, defendant paid the sum of $15, which was the last payment made by her in cash. Defendant gave each of the three children a $50 war bond for Christmas in 1945. Defendant has been receiving $56.30 per month as principal beneficiary.

Defendant testified that when she asked Maureen in November 1944 whether she knew the insurance had been changed and defendant made the beneficiary, Maureen said she did not know about it, and that her former husband could not do that after "he had had it fixed for her." Defendant admitted that Maureen asked her several times if

she had heard anything about the insurance money, but she denied that she had ever had any conversation about holding the insurance proceeds in trust or for the benefit of the children. She said she did not know what the word "trust" meant at the time, and that the first attorney she employed after the controversy arose likewise did not know what it meant to set up a trust fund, so he sent her to a trust company to find out about trusts and trust funds. Defendant also testified that while her son was home on furlough, he told her he had changed the insurance and made her beneficiary, and that she asked him why he did that and he merely said he wanted her to have the money if anything happened to him. She denied that she had any conversation with Mrs. Muir about the insurance. She did not mention anything to Maureen about the insurance until after her son was killed in action.

Defendant admitted that she went to a trust company with her former attorney, but she said she did not remember what was said to her about setting up a trust. Her attorney advised her that the children were in need, had been down with measles, and that he had had a conversation with Maureen's attorney about setting up a trust fund, and defendant's attorney thought the best thing to do was to put this money under the jurisdiction of the court for the support of the children. Defendant told her attorney to "forget the whole matter" because she was not going to follow such recommendation. Defendant testified that she loved those children, was not too friendly with Maureen, and that she knew her son loved his children and was concerned with their well-being; but she testified that he never said one word about using the insurance money for their well-being. She further declared that the reason she paid some of the money to Maureen after she collected on the insurance, was to help them out because they were in need. She stated that Maureen asked her for money, not insurance money, but just money to buy a refrigerator and other things for the children.

The court determined the issues in favor of the plaintiffs, made rather detailed findings in accordance with the testimony of plaintiff's witnesses, and entered decree establishing a trust in the funds, and gave credit for payments actually made including the war bonds. On this appeal defendant contends that the evidence was not sufficient to warrant any conclusion of law that a trust was created in the insurance proceeds, and that the judgment and decree impressing a trust upon the insurance proceeds is contrary to the adjudicated cases and also without statutory authority. It is argued by appellant that the decision of the lower court operates to alter a written contract by parol, and to fasten upon such instrument an amendment which could only be made in writing.

Respondents do not ask for an amendment of the policy, nor for an amendment of the instrument changing the beneficiary form. They simply ask that when the proceeds come into the hands of defendant who is designated as the "principal beneficiary," that those proceeds be impressed with a trust for the use and benefit of the plaintiff children who are designated as the "contingent beneficiaries" in said contract of insurance. In order to establish a fiduciary obligation on the part of defendant as principal beneficiary to apply the proceeds to the use and benefit of the minor children who were legal dependants of the insured, it is necessary to rely on parole evidence and conduct of the parties. Appellant claims that under the rules laid down in *Chambers* v. *Emery*, 13 Utah 374, 392, 45 P. 192, and *Skeen* v. *Marriott*, 22 Utah 73, 89, 61 P. 296, 300, the evidence is insufficient and inadequate to establish a parol trust in the insurance proceeds in the hands of defendant.

The substance of the rules announced in those cases is that where a party seeks to establish a trust by parol, the evidence must be clear, convincing and unequivocal. The evidence must be clear and unambiguous. It must be convincing and satisfy the trier of the facts that it is free from fabrication. It must be definite, so that no doubt is left as to the subject matter of the trust or trust

res, or the rights and obligations of beneficiary and trustee. Testimony which is designed to establish a trust must be carefully scrutinized, to ascertain whether it is so attended with such circumstantial guarantees of trustworthiness that it is entitled to credence. The evidence must clearly show not merely an intention to create a trust, but some act or declaration sufficient to show that such intention was properly carried into effect. See *Hansen* v. *Hansen,* 110 Utah 222, 171 P. 2d 392. None of the elements of a trust can be left to conjecture. The evidence must be such that it will clearly lead to the conclusion that the specific property in controversy is held by the person sought to be charged as trustee, for the use and benefit of others.

Does the evidence in this case meet the tests of "evidence which is clear, unequivocal, satisfactory and convincing?" To determine this question we must scrutinize the entire record, including the exihibits, and the relationship of the parties; for what may constitute adequate proof in one situation may not be satisfactory evidence in the light of other relationships. If the claims made in view of the established circumstances are inherently improbable, or happen to have been asserted under circumstances which would infer that they are the result of "wishful thinking," the evidence would be considered unsatisfactory. Equity will not impose the duties of a trustee upon the donee of insurance proceeds merely because the insured would have done so if he had used good judgment. It is the function of courts of equity to enforce obligations which were created by the acts of the parties, not to fashion new obligations out of rights improvidently established.

In this case the insured had three dependent children. They were his sole dependents. His mother was not dependent upon him for support. At first he made his former wife the principal beneficiary. While his letters to her indicate that he continued to be in love with her and extremely fond of the children, his conduct and expressions indicated that he had no confidence in her business judgment. He implicity trusted his mother. In fact, he sent

some money home to her. He was not dealing with a stranger and could not be expected to resort to the same formalities which might be anticipated in dealing with a stranger.

As far as the record shows, the only form for change of beneficiary which was available for decedent to execute was the one which he did execute, which permitted the naming of a "Principal Beneficiary" and also "Contingent Beneficiaries." The term "principal beneficiary" on the form in evidence does not preclude the possibility that the person so named would be required to hold the proceeds collected in trust for the "contingent beneficiaries." The insured manifested dissatisfaction with the conduct of his former wife, sought to have her cut off from an allotment. It is true that five weeks before he solicited the help of the Red Cross executive, he had already executed the change of beneficiary form. When he presented the copy to Mrs. Muir with the request that she keep it for him, he stated that he had made his mother the beneficiary so that if anything happened to him the money would be used for his children. Mrs. Muir explained that he said he wanted the proceeds divided among his children as indicated on that form. Mrs. Muir subsequently had a conversation with the mother of the insured, and the conversation with the boy was discussed. The defendant on that occasion expressed her concern about the children and the provisions made for the children. The conversation seemed to leave no doubt in the mind of Mrs. Muir that defendant was to use the insurance proceeds for the children. There seems little likelihood that Mrs. Muir who was acquainted with defendant and unacquainted with the mother of plaintiffs, would color her testimony to incur the antagonism of defendant.

While defendant categorically denied that she told her former daughter-in-law that her son said he had changed the insurance beneficiary to enable her to handle the money for the children, there are certain aspects of the testimony of defendant which would lead to the conclusion that she did in fact agree with her son to hold the proceeds for the benefit of his minor children, and that she stated after his

death that she was collecting the insurance proceeds for the benefit of the children. Defendant admitted that Maureen, mother of the children, called her a number of times on the telephone and asked when the insurance money was coming. There was some expectation that the insurance money was to be used for the children. While defendant insisted that she paid over money for her grandchildren after she collected some of the insurance money merely by reason of the fact she knew those children were in want, the fact is that they were in want before the insurance money was collected.

Defendant showed by her testimony that when Maureen employed legal counsel, defendant also employed legal counsel, and that her legal counsel went with her to a trust company. Her explanation as to the purpose of going there is not convincing. She had counsel, yet she said the reason for going to the trust company was the fact that Maureen's attorney wrote a letter telling her to set the money up in a trust fund for the children, and that her attorney did not know the meaning of the term "trust" or "trust fund" so they both went to the trust company to be enlightened as to the meaning. The situation related is highly improbable. If an attorney did not know the meaning of such terms so frequently used in the law and in business transactions, he would hardly be expected to advertise his inexcusable ignorance by confessing to his client and accompanying the client to a trust company. Defendant admitted that her attorney told her that this insurance money should be put in a trust fund, so it is likely that when he advised her he knew what he was talking about, and that he advised her conscientiously. We do not mean to say that in giving advice an attorney might not counsel a client to compromise to avoid unprofitable litigation, but if defendant had disclosed the facts to her attorney he would have advised her in the light of those facts. The record does not show what she told her attorney, except by way of rejection of his advice. However, the record does show that her attorney advised her to have the money put in trust under the jurisdiction of the court

for the benefit of the children, and that she resented such advice and discharged her counsel. Although a client may seek advice from legal counsel, at times a client may merely solicit confirmation of what the client is already determined to do. No definite conclusion may be drawn as to what facts defendant actually related to her attorney, except as we may infer by what she did. She went to a trust company and discussed the matter there. Such conduct may not be conclusive, but it is some evidence of the fact that she recognized that she was obligated as trustee. Otherwise, it seems strange indeed that she did not dismiss the entire matter from consideration before the time she went to the trust company.

As indicated in *Jimpson* v. *Chandler*, 61 Utah 325, 329, 212 P. 1113, the fact that neither Maureen nor her minor children knew anything of the change in beneficiary or the purpose for the change until after the insured was killed in action would not preclude the creation of a trust in the insurance proceeds; for a trust can be declared without the knowledge of the beneficiaries. Where a trust is created for infant children, such beneficiaries would be unable to understand that they are beneficiaries. Nevertheless a trust for their benefit can be enforced.

There appears to be sufficient evidence in this case based upon the admissions of defendant which are attended with circumstances of trustworthiness, that defendant agreed with the insured that she would apply the proceeds for the benefit of his children. There is likewise sufficient competent evidence that defendant declared herself trustee of the insurance fund after the death of the insured.

It is true that in most of the situations where a trust in property has been attempted to be established by parol, we have held that the evidence was not clear and convincing or was otherwise unsatisfactory. Considering the entire record, and the admissions of the defendant who is sought to be charged as trustee, and her conduct with respect thereto, the proof in this case appears to us to meet the require-

ments above set out herein. It is true that in nearly all cases decided by this court we have held that in order to establish a trust by parol, the proof must be clear and convincing; but some of the clear and convincing evidence may be furnished by the defendant as in this case. As stated in *Matson* v. *Matson,* 56 Utah 394, 401, 190 P. 943, 946:

"* * * Defendant denied the alleged conversations * * * but her testimony from beginning to end was vague, uncertain, and far from satisfactory. It utterly failed to meet the case made by plaintiff. Even admitting that where an attempt is made to establish a trust under circumstances such as exist in the present case the evidence should be clear, cogent, and convincing, we are of the opinion that the evidence on behalf of plaintiff in the case at bar responds to the measure of proof required."

Judgment affirmed. Costs to respondents.

LARSON, C. J., and PRATT, WADE, and WOLFE, JJ., concur.