UNITED STATES of America,
Plaintiff-Appellee,

and

Antonucci et al., and United Mineworkers
of America, Intervenors-Appellees,

v.

STATE OF NEW MEXICO and the
Hospitals Institutions Board et al.,
Defendants-Appellants.

No. 75–1103.

United States Court of Appeals,
Tenth Circuit.

Argued and Submitted Jan. 27, 1976.

Decided June 22, 1976.

Leslie D. Ringer, Asst. Atty. Gen., Santa Fe, N. M. (Toney Anaya, Atty. Gen., and William McEuen, Asst. Atty. Gen., Santa Fe, N. M., on the brief), for defendant-appellants.

Stephen L. Urbanczyk, Dept. of Justice, Washington, D. C. (Wallace H. Johnson, Asst. Atty. Gen., Washington, D. C., Victor R. Ortega, U. S. Atty., and James B. Grant, Asst. U. S. Atty., Albuquerque, N. M., and Edmund B. Clark, Jacques B. Gelin and Neil T. Proto, Attys., Dept. of Justice, Washington, D. C., on the brief), for plaintiff-appellee.

Norman S. Thayer, of Sutin, Thayer & Browne, Albuquerque, N. M. (Joseph Yablonski and Willard Owens, Washington, D. C., on the brief), for intervenors-appellees.

Before LEWIS, Chief Judge, and BREITENSTEIN and McWILLIAMS, Circuit Judges.

LEWIS, Chief Judge.

The United States brought this action seeking enforcement of the trust provisions of land grants of 100,000 acres made to New Mexico by Congress for "a miners' hospital for disabled miners." As representative beneficiaries, the district court allowed 28 individual New Mexico miners and the United Mine Workers of America to intervene. On a motion for summary judgment, the district court found that New Mexico was in breach of the trust provisions governing the land grants and ordered an accounting and compliance with the trust provisions. New Mexico appeals several aspects of the lower court's judgment.

In 1898, the Ferguson Act, c. 489, 30 Stat. 484, gave the Territory of New Mexico 50,000 acres of federal land for "a miners' hospital." Pursuant to this grant the Terri-

tory of New Mexico established the Miners' Hospital of New Mexico at Raton which commenced operation in 1905. An additional 50,000 acres were given in trust to New Mexico under the New Mexico Enabling Act, c. 310, 36 Stat. 557, for "miners' hospitals for disabled miners." In its constitution New Mexico expressly accepted the conditions imposed on each of the land grant trusts, confirmed the Miners' Hospital at Raton as a state institution, accepted all of the trust lands, and stated that they would be "exclusively used for the purpose" for which they were granted. N.M.Const. art. XXI, § 9 and art. XIV, §§ 1, 2.

Until 1968 Miners' Hospital was administered by a separate board of trustees and all revenues accruing from its four trust funds established in 1917 were maintained in a separate trust account. In 1968 New Mexico consolidated the administration of its hospitals, giving control of all state hospitals to the New Mexico Hospitals and Institutions Department (HID). Pursuant to this reorganization all of the assets and control of Miners' Hospital went to HID. The separate account for trust revenues was closed by HID in 1969 and its revenues were commingled with all other HID income received from other state hospital facilities and institutions. HID also transferred equipment and supplies from Miners' Hospital to other institutions without charge.

In 1971 HID changed Miners' Hospital from a "General and Special Chronic Hospital" to an intermediate care facility, the basic distinguishing characteristic between the two being that the latter institution does not provide surgical care.[1] After the change HID ceased to acquire hospital equipment and make capital improvements which were necessary in order for Miners' Hospital to retain its accreditation as a

general hospital. As a result Miners' Hospital did lose its accreditation in 1971 and thereafter eligible miners who were in need of health services not available at Miners' Hospital were admitted at other accredited general hospitals, the payment for such care being charged to the income from Miners' Hospital's trust funds.

In ruling against the state of New Mexico, the district court ordered that the state maintain a separate general hospital for disabled miners, that trust funds be spent only at Miners' Hospital, that trust funds not be commingled, and that certain funds be restored to the trust funds. The district court disallowed certain setoffs requested by New Mexico and refused to apply the doctrine of cy pres. New Mexico appeals that portion of the district court's judgment requiring it to maintain a separate, licensed, and certified hospital for the benefit of disabled miners, prohibiting it from expending trust funds for the medical care of disabled miners at medical institutions other than Miners' Hospital, and disallowing it any setoff for certain administrative costs incurred by the state in the operation of Miners' Hospital.

### I.

A main area of contention in this litigation centers on the purpose for which Congress granted the trust lands to New Mexico. New Mexico argues that Congress granted the 100,000 acres for the primary purpose of promoting the public welfare by attending to the health needs of disabled miners and that the trust terms should be liberally construed to effectuate this purpose. On the other hand the United States and the intervenors assert that the Enabling Act must be strictly construed and that the purpose of the trust is plainly stated in

---

1. An "intermediate care facility" is defined as:

    an institution which (1) is licensed under State law to provide, on a regular basis, health-related care and services to individuals who do not require the degree of care and treatment which a hospital or skilled nursing facility is designed to provide, but who because of their mental or physical condition require care and services (above the level of room and board) which can be made available to them only through institutional facilities. . . .

42 U.S.C. § 1396d(c). In its regulations, HEW has further explained the meaning of "intermediate care facility." 45 C.F.R. § 234.130(d)(3) (1975).

the Enabling Act—that of establishing and maintaining a "miners' hospital."

In construing the Enabling Act the Supreme Court citing the restrictions placed on the use of the trust lands has consistently applied a narrow interpretation to the terms of the Enabling Act. *Alamo Land & Cattle Co. v. Arizona*, 424 U.S. 295, 96 S.Ct. 910, 47 L.Ed.2d 1, 44 U.S.L.W. 4217 (1976); *Lassen v. Arizona Highway Dep't*, 385 U.S. 458, 87 S.Ct. 584, 17 L.Ed.2d 515; *Ervien v. United States*, 251 U.S. 41, 40 S.Ct. 75, 64 L.Ed. 128. Because of previous abuses of federal lands granted in trust to the states, the Court observed that it had been Congress' intent "[t]o preclude any license of construction or liberties of inference" when construing the Enabling Act. *Ervien v. United States, supra*, at 47, 40 S.Ct. at 76.

■ Therefore applying a narrow interpretation of the terms of the Enabling Act, we cannot agree with New Mexico's broad construction. While the underlying motivation for the trust may have been a desire on the part of Congress generally to provide for the health care of miners, the specific purpose of the trust was the establishment and maintenance of a "miners' hospital." The wording of the Enabling Act evidences a determination by Congress that the health needs of New Mexico miners could best be provided by a separate hospital for miners. To imply a more expansive purpose for the trust than that stated in the Enabling Act is to indulge in a license of construction which Congress intended to prevent.

After full hospital care and treatment were no longer available at Miners' Hospital, if disabled miners were in need of medical care not provided for them at the hospital, New Mexico would place them in other hospitals and pay for this health care out of trust funds. The district court ruled that

this arrangement was improper since trust funds could not be "expended or employed at institutions" other than Miners' Hospital.

■ Senator Beveridge, chairman of the Senate Committee on Territories, in describing the controls placed in the Enabling Act on administration of trust lands, stated that the trust lands were being given to the states "for specific purposes, and that restrictions should be thrown about it which would assure its being used for those purposes." [2] 45 Cong.Rec. 8227. Citing this and similar portions of the legislative history the Supreme Court concluded that:

> The Enabling Act unequivocally demands both that the trust receive the full value of any lands transferred from it and *that any funds received be employed only for the purposes for which the land was given.*

*Lassen v. Arizona Highway Dep't*, 385 U.S. 458, 466, 87 S.Ct. 584, 588, 17 L.Ed.2d 515 (emphasis added). Since the purpose of the trust was to establish and to maintain a "miners' hospital," the provisions requiring that the trust funds only be expended for the trust purpose are to be literally construed. This literal construction means that trust funds cannot be spent at other hospitals even though such money is being used to provide health care for miners. We concur with the district court's determination that the trust funds are allotted solely for use at Miners' Hospital at Raton or any other hospital New Mexico may wish to maintain as a "miners' hospital."

■ A related issue is whether the district court erred in holding that the trust requires New Mexico to operate a separate hospital for disabled miners which is licensed and certified under contemporary standards as a general hospital. The resolution of this issue necessitates a definition of the term "hospital." When, as is the case here, a term is not defined by the

---

2. Section 10 of the New Mexico Enabling Act is the statutory restatement of Senator Beveridge's concern. It provided in part that:

Disposition of any of said lands, or of any money or thing of value directly or indirectly derived therefrom, *for any object other than that for which such particular lands*, or the

lands from which such money or thing of value shall have been derived, were granted or confirmed, or in any manner contrary to the provisions of this act, shall be deemed a breach of trust. . . .

c. 310, 36 Stat. 557 (1910) (emphasis added).

statute, it is appropriate for the court to interpret the word in accordance with its ordinary, everyday meaning. *First Nat'l Bank & Trust Co. v. United States*, 10 Cir., 462 F.2d 908, 910. When used in the applicable sense, "hospital" connotes "an institution or place where sick or injured persons are given medical or surgical care." Webster's Third New International Dictionary 1093 (1971). It is generally understood that at a minimum a hospital affords surgical care.

■ While this may be the currently understood definition of "hospital" New Mexico contends that the point in time for defining the term is 1910, when the Enabling Act was passed. Yet New Mexico readily admits that it was not Congress' intent to allow the "miners' hospital" to function according to the "archaic standards" of that time. We must agree. Surely Congress contemplated that the trust institutions to be established pursuant to the Enabling Act, such as the penitentiary, the school of mines, or the miners' hospital, would utilize improved methods and technology as they became available, be they educational, penal, or medical.

■ Even if we employ a contemporary definition, New Mexico asserts that it was an error to require Miners' Hospital to be a certified, licensed general hospital since those terms are of recent origin[3] and not within the contemplation of Congress. The generally understood meaning of "hospital" does not include the licensing or certification requirements. However, in New Mexico in order for Miners' Hospital to provide the minimum level of medical care and treatment ordinarily thought to be provided by hospitals it must at least comply with New Mexico's licensing requirements,[4] and in order to qualify for federal funds would also have to be certified.

■ When construing a statute the courts may give great weight to the interpretation placed on the statute by those charged with its administration. *Zemel v. Rusk*, 381 U.S. 1, 11, 85 S.Ct. 1271, 14 L.Ed.2d 179; *Udall v. Tallman*, 380 U.S. 1, 16–18, 85 S.Ct. 792, 13 L.Ed.2d 616. As trustee, New Mexico has the primary responsibility for administering Miners' Hospital, but the United States also "has a continuing interest in the administration" of the trusts created by the Enabling Act. *Alamo Land & Cattle Co. v. Arizona*, 424 U.S. 295, 96 S.Ct. 910, 47 L.Ed.2d 1, 44 U.S.L.W. 4217 (1976); *Lassen v. Arizona Highway Dep't*, 385 U.S. 458, 460, 87 S.Ct. 584, 17 L.Ed.2d 515. From the time of its inception in 1905 pursuant to the provisions of the Ferguson Act until 1971, both New Mexico and the United States apparently agreed as to the terms of the trust. During that period Miners' Hospital was maintained by New Mexico as a separate institution which provided the full range of health care commonly associated with hospitals, including surgical and maternity care. New Mexico's longstanding interpretation of the trust arrangement was never challenged by the United States until 1971, when New Mexico converted Miners' Hospital into an intermediate care facility. As long as Miners' Hospital was operated as a general hospital, both parties entrusted with the supervision and administration of the trust agreed with the interpretation of

---

**3.** "Licensing" of hospitals is the procedure by which New Mexico grants its authorization for a health institution to operate within the state. N.M.Stat.Ann. § 12–34–5 (Supp.1975). New Mexico first began licensing health care facilities in 1947. "Accreditation" (the district court apparently used "certification" interchangeably with "accreditation") is an approval of the quality of care provided at an institution which is awarded by the Joint Commission on Accreditation of Hospitals, a nongovernmental association. Miners' Hospital received its first accreditation in 1956 which it retained until 1971.

**4.** The New Mexico Department of Public Health has defined a "general hospital" as:

> A general hospital has capacity for at least ten (10) beds and provides, on a continuing 24–hour basis, in-patient facilities and resources for maternity care and for medical and surgical care to the sick and injured, and has laboratory and X-ray facilities and services. It provides at least one currently licensed professional nurse on duty at all hours.

New Mexico Department of Public Health Licensing Regulations, Part 2, *as amended*, Aug. 20, 1965.

the trust terms. This also is supportive of the trial court's holding.

■ A final observation in support of the district court's determination is the fact that when Congress granted 50,000 acres under the Enabling Act for "miners' hospitals" New Mexico had already constructed and commenced operation of Miners' Hospital at Raton pursuant to the earlier trust grant of 50,000 acres in the Ferguson Act for "a miners' hospital." For five years prior to the second grant for the same trust purpose, New Mexico had operated a hospital for disabled miners which included surgical care. By granting an additional 50,000 acres for the same trust purpose Congress impliedly consented to New Mexico's interpretation of the Ferguson Act. The ordinary meaning of "hospital," the interpretation given the trust provisions by both New Mexico and the United States from 1905 to 1971, and the operation of Miners' Hospital for five years prior to Congress' second grant of land for the same trust purpose, support the trial court's conclusion that Miners' Hospital must be operated as a licensed and certified general hospital.

## II.

During the court-ordered accounting the parties disagreed as to whether New Mexico should be allowed to set off against the amount it had to repay to the trust fund the cost of certain administrative expenses it incurred in operating Miners' Hospital as an intermediate care facility between June 30, 1968, and March 31, 1974. The amount, $50,945, was that portion of the centralized administrative costs of HID in Santa Fe which was attributable to operating Miners' Hospital during this time period.[5] The set-off was not allowed by the district court.

■ The district court's basis for not allowing New Mexico to recoup this administrative overhead is unclear,[6] but it is the Government's position that New Mexico should not be permitted to set off these expenses incurred while it was acting in violation of the trust citing as authority section 243 of the Second Restatement of Trusts. This section, however, is inapplicable to the present situation since it deals with the trustee's compensation and not with administrative expenses. But the subsequent section, section 244, does allow for the indemnity of properly incurred expenses. Even though the expenses arose while in breach of the trust, if the trustee has reimbursed the trust fund for any loss that resulted from the breach, administrative expenses are properly recoverable. Restatement (Second) of Trusts, § 244, comment e.

■ In 1968 when New Mexico reorganized its statewide hospital operations certain administrative functions which had previously been performed at each hospital were transferred to a centralized operations in Santa Fe. Prior to this centralization Miners' Hospital had had a resident admin-

---

5. In arriving at the portion of the administrative overhead of HID's central office in Santa Fe that was attributable to Miners' Hospital, New Mexico took the total of the administrative overhead incurred between July 1, 1968, and February 28, 1974, and multiplied it by the ratio of total miners' patient days during that time period to the total patient days of all of the state hospitals administered by HID.

$$\frac{\text{Miners' patient days}}{\text{Total patient days}} \times \text{Administrative Overhead} = \text{Trust Obligation}$$

In a hearing discussing this problem the Government stated that it did not question the accounting principles applied in arriving at the percentage of administrative overhead attributable to Miners' Hospital, but rather doubted the propriety of doing such since the trust was being unlawfully administered during that period.

6. The district court apparently based its denial of the setoff for administrative overhead expenses on the fact that during the period that HID administered Miners' Hospital, although the trust funds showed an excess of revenues, the hospital facility itself did not generate any surplus income. The court said:

I think I cannot permit the allowance of the overhead charge. If I could find anywhere where it had produced actual surplus revenue or something like that, then I could see an argument. Under the circumstances, I think it is not allowable.

istrator and comptroller compensated directly out of the miners' trust funds, but these positions were discontinued after the administrative functions were transferred to HID's offices in Santa Fe. New Mexico simply requests that it be allowed to recover administrative overhead costs which were formerly incurred in Raton but now constitute a portion of the overall cost for administering all of the state hospitals which are paid out of general state funds. New Mexico's noncompliance with the trust terms was not motivated by bad faith but, as the district court concluded, was the result of New Mexico's good faith misreading of "the strict requirements" of the trust. Because of the technical nature of the breach and the fact that New Mexico is reimbursing the trust funds for all losses resulting from the breach, we disagree with the district court's determination that New Mexico cannot be allowed a setoff in the amount of the administrative overhead costs. The judgment should be so modified and is in all other respects

Affirmed.

