UNITED MINE WORKERS OF AMER-
ICA, DISTRICT NO. 22 and Michael
Svetich, Maurice Brown, Charles Byrge,
and J.R. Scott, Plaintiffs,

v.

STATE OF UTAH, the School and Institu-
tional Trust Lands Administration, John
Does I through XX and State Agencies I
through XX, Defendants.

No. 2:96 CV 0695K.

United States District Court,
D. Utah,
Central Division.

May 7, 1998.

Robert B. Sykes, James D. Vilos, Sykes &
Vilos, Salt Lake City, UT, Kerry L. Chlar-
son, Sandy, UT, for Plaintiffs.

Valden P. Livingston, Reed M. Stringham,
III, Utah Attorney General's Office, Salt
Lake City, UT, for Defendants.

Gayle F. McKeachnie, McKeachnie & All-
red, Vernal, UT, Clark A. McClellan,
McKeachnie Allred & McClellan, Vernal, UT,
for Amicus.

## MEMORANDUM DECISION AND ORDER

KIMBALL, District Judge.

This matter is before the court on Defen-
dants' Motion to Dismiss and Plaintiffs' Mo-
tion for Partial Summary Judgment. This
matter came on for hearing on March 3,
1998. The plaintiffs were represented by
James D. Vilos and Kerry L. Chlarson. The
defendants were represented by Valden P.
Livingston. The Utah State Board of Edu-
cation appeared Amicus Curiae and was rep-
resented by Gayle F. McKeachnie. Oral ar-
gument was heard and the court took the
matter under advisement. The court has
carefully considered all pleadings, memoran-
da, and other materials submitted by the

parties. The court has further considered the law and facts relevant to the parties' motions. Now being fully advised the court enters the following memorandum and order.

## I. BACKGROUND

This matter arises out of a long and complicated history beginning before Utah became a state of the United States of America. In 1894 Utah received lands under the Utah Enabling Act of July 16, 1894, Ch. 138, 28 Stat. 110 § 12, (the "Utah Enabling Act"), for the purpose of constructing a miners' hospital. The Utah Enabling Act reads in pertinent part as follows:

... the following grants of land are hereby made to the State, for the purposes indicated, namely:

For the establishment of permanent water reservoirs for irrigating purposes, five hundred thousand acres; for the establishment and maintenance of an insane asylum, one hundred thousand acres; for the establishment and maintenance of a school of mines in connection with the university, one hundred thousand acres; for the establishment and maintenance of a deaf and dumb asylum, one hundred thousand acres; for the establishment and maintenance of a reform school, one hundred thousand acres; for establishment and maintenance of State normal schools, one hundred thousand acres; for establishment and maintenance of an institution for the blind; one hundred thousand acres; **for a miners' hospital for disabled miners, fifty thousand acres.** The United States penitentiary near Salt Lake City and all lands and appurtenances connected therewith and set apart and reserved therefor are hereby granted to the State of Utah. The said State of Utah shall not be entitled to any further or other grants of land for any purpose than as expressly provided in this Act; **and the lands granted by this section shall be held, appropriated, and disposed of exclusively for the purposes herein mentioned, in such manner as the legislature of the State may provide.** (emphasis added). In 1896, on January 4, Utah became a state of the United States of America. *See* Act of January 4, 1896, No. 9, 29 Stat. at Large 876. On February 20, 1929, an additional 50,000 acres was given to the State of Utah for a miners' hospital. *See* 45 Statutes at Large 1252 (1927–1929). This additional 50,000 acres was given to the State due to the fact that all other land grants under the Utah Enabling Act had been for 100,000 acres and the State requested an additional 50,000 acres· due to the belief that 50,000 acres was not sufficient to carry out the purpose of the grant. *See* 53 Cong. Rec. 1794, 3600 (1929) (statements of Rep. Colton).

The State of Utah has never used the money from the land grant specifically for a separate stand alone miners' hospital. However, in 1959 the State transferred all proceeds from the land to the University of Utah for the purpose of establishing a rehabilitation center. Utah Code Ann. §§ 53B–17–201 and 202 (1953, enacted by L.1987) provides as follows:

There is appropriated to the University of Utah all funds, assets and revenues which have been, or will be, derived from the sale or other disposition of those lands conveyed to the state of Utah by those certain federal grants for a Miners' Hospital for Disabled Miners contained in Section 12 of the Enabling Act and in Chapter 280, Public Laws of the Seventieth Congress, 2nd Session (Act of February 20, 1929) which funds, assets and revenues now are, or in the future will be, in the custody and control of the Board of State Lands.

The funds, assets and revenues shall be used for the construction, equipment, furnishings, and operation, or either or any of the same, on the campus of the university of a rehabilitation building, either as a separate structure or as an integrated unit in the University of Utah Medical Center.

*Id.* Although the rehabilitation center does treat disabled miners free of charge, it is not a miners' hospital per se and it treats a variety of other people as well.

The plaintiffs in this action are comprised of the United Mine Workers of America (District 22) which is comprised· of and represents many of Utah's disabled miners. The individually named plaintiffs are all people who have disabilities caused by their employment as miners. The physical ailments suffered by these individuals include silicosis,

industrial bronchitis, asbestosis and pneumoconiosis. All of these ailments are unique to the mining industry or disproportionately found among miners. In their Complaint, the plaintiffs have alleged one cause of action for Breach of Trust. The plaintiffs allege that the Utah Enabling Act created a trust with the State as trustee and the disabled miners as beneficiaries. They argue that as trustee, the State has diverted the trust corpus and trust revenue to purposes other than the intended purpose, that is to build a hospital for disabled miners, and that the disabled miners, as beneficiaries have the right to seek the enforcement of the trust. They further allege that the defendants have caused or permitted to be caused, waste upon the assets of the trust in that they have failed to select the lands granted to the state in a timely manner and have not selected all 100,000 acres. The defendants have further failed to account for and apply net income from the miners' hospital trust lands to the maintenance of a miners' hospital for disabled miners and have failed to manage the lands and revenues generated from the lands in the most prudent and profitable manner possible, including, but not limited to the practice of passively selecting lands only when private individuals or entities came to the defendants and requested that they select some land so they could purchase it. Based on these allegations, the plaintiffs further allege that the defendants have willfully and maliciously breached their duty of trust in that they never used any of the funds to support a miners' hospital. Further, plaintiffs allege that the defendants willfully and maliciously used those funds in a manner that is inconsistent with the best interests of the trust beneficiaries.

The plaintiffs request that this court enter judgment in their favor ruling that the State has violated its trust duties to the beneficiaries, compelling the State to produce a complete and accurate accounting of the trust corpus, and requiring the State to deposit all amounts of money from the sale of the trust lands, together with interest from the date of sale, into a common fund, from which a miners' hospital shall be established and maintained. Further, the plaintiffs request that this court enter judgment compelling the State to deposit additional funds as are necessary to construct and maintain a miners' hospital for disabled miners as a damage for failure to do so previously. Defendants move this court to dismiss the complaint against them in its entirety on the grounds that plaintiffs have failed to state a claim for which relief can be granted.

## II.  STANDARD OF REVIEW

■ A complaint will not be dismissed for failure to state a claim "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Shoultz v. Monfort of Colorado, Inc.,* 754 F.2d 318 (10th Cir.1985), *citing Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–102, 2 L.Ed.2d 80 (1957) (footnote omitted). For purposes of considering a motion to dismiss, the court is to accept all of the factual allegations in the plaintiffs' complaint as true and ask whether, in these circumstances, dismissal of the complaint is appropriate. *See Berkovitz v. United States,* 486 U.S. 531, 540, 108 S.Ct. 1954, 1961, 100 L.Ed.2d 531 (1988). Legal conclusions, deductions, and opinions couched as facts are, however, not given such a presumption. *Mitchell v. King,* 537 F.2d 385 (10th Cir.1976); *Swanson v. Bixler,* 750 F.2d 810 (10th Cir.1984).

## III.  DISCUSSION

### A.  Creation of a Trust Under Utah Enabling Act

■ The central issue that must be addressed is whether or not the Utah Enabling Act creates a trust with the State as the trustee, and disabled mine workers as the beneficiaries. A trust is defined as

> ... a fiduciary relationship with respect to property, subjecting the person by whom the title to the property is held to equitable duties to deal with the property for the benefit of another person, which arises as a result of a manifestation of an intention to create it.

Restatement (Second) Trusts § 2 (1959). As stated above, in order for a trust to exist, there must be a manifestation of an intention to create the trust. In this case, Congress must have intended the Utah Enabling Act to create a trust, with the State as trustee,

for the benefit of the mine workers. In *Sundquist v. Sundquist,* 639 P.2d 181 (Utah 1981), the Utah Supreme Court set forth the principles governing the creation of trusts.

The principles governing the creation of a trust are well settled. An inter vivos trust is created when a settlor, with intent to create a trust, transfers property to a trustee in trust for, or declares that he or she (the settlor) holds specific property in trust for, a named beneficiary. Restatement of Trusts 2d § 2, 17. The settlor need not sign a formal trust instrument or employ any particular form of words. *Capps v. Capps,* 110 Utah 468, 175 P.2d 470 (1946) *Acott v. Tomlinson,* 9 Utah 2d 71 337 P.2d 720 (1959); Bogert, Trusts & Trustees, s 45 (2d ed.1965); Restatement of Trusts 2d, s 24. But the settlor must have an intent to create a presently enforceable trust, *Pagano v. Walker,* 539 P.2d 452, 455 (Utah 1975), the trust property must be clearly specified and set aside, *Renshaw v. Tracy Loan & Trust Co.,* 87 Utah 359, 363, 35 P.2d 298 (1934), and the essential terms of the trust must be clear enough for the court to enforce the equitable duties that are the sine qua non of a trust relationship. Restatement of Trusts 2d § 2, 4; *Pagano v. Walker,* 539 P.2d at 454; *Duchesne County v. State Tax Commission,* 104 Utah 365, 371, 140 P.2d 335, 338 (1943).

*Id.* 639 P.2d at 183–84.

In order for a trust to exist pursuant to Section 12 of the Utah Enabling Act, there must be relevant statutory and regulatory provisions, contained within the act, which set forth the enumeration of the duties of the trustee, in this case the State, which would justify a conclusion that Congress intended the creation of a trust. The starting point in this analysis is the language of the Utah Enabling Act itself. Section 12 of the Enabling Act states in part that:

[T]he lands granted by this section shall be held, appropriated, and disposed of exclusively for the purposes herein mentioned, in such manner as the legislature of the State may provide.

The language of Section 12 does not use the word "trust" in its description of how the land grants are to be held. In *Whiskers v. United States,* 600 F.2d 1332 (10th Cir.1979),

the Tenth Circuit discussed whether or not a trust existed for the benefit of the Paiute Indians pursuant to the Second Supplemental Appropriations Act and The Southern Paiute Judgment Distribution Act which were enacted to provide distribution of a judgment fund to the Paiutes. The plaintiffs in that matter were individual Indians who brought a breach of trust action against the United States for failure to make adequate attempts to enroll eligible persons residing in remote areas which resulted in the failure of plaintiffs, and the class they represented, to receive their rightful shares of the settlement. In *Whiskers* the Tenth Circuit held as follows:

Unless it appeared affirmatively that Congress meant to create something less than a trust relationship when it used the term "trust" in referring to a particular fund, we would necessarily assume that Congress intended to establish nothing less than a valid trust complete with fiduciary duties and concomitant financial liability for their breach.

*Id.* 600 F.2d at 1335. The Court went on to hold that Congress did not intend to create a trust by way of the Appropriations Act in that it was not indicated in any way in the act that a trust relationship should exist. In the matter at hand, Section 12 of the Utah Enabling Act does not indicate that a trust relationship exists. The Enabling Act states that the lands shall be held and appropriated exclusively for the purposes herein "in such manner as the legislature of the state may provide". The Enabling Act does not use the word "trust" in its designation of the land grants. The Supreme Court and the Tenth Circuit have made it clear, however, that simply because the term "trust" is not used, it does not automatically follow that a trust does not exist. In *Jicarilla Apache Tribe v. Supron Energy Corporation,* 728 F.2d 1555 (10th Cir.1984) (Seymour, J., concurring and dissenting opinion which became the majority opinion of the Tenth Circuit on rehearing *en banc* ) on reh'g en banc, 782 F.2d 855 (10th Cir.1986), the Tenth Circuit held that:

[W]e [have] made it clear that no particular words or phrases are critical to the finding of a trust relationship. "The use of the word 'trustee' is not absolutely essential to the finding of a trust relationship

when it is otherwise clear that Congress intended a trust relationship to exist." *Whiskers v. United States,* 600 F.2d 1332 (10th Cir.1979), cert. denied, 444 U.S. 1078, 100 S.Ct. 1028, 62 L.Ed.2d 761 (1980). Rather the test is whether "the relevant statutory and regulatory provisions contain an enumeration of duties which would justify a conclusion that Congress intended the Secretary to be a trustee." *Id.* 600 F.2d at 1338. In *Mitchell II,* the Court reviewed the statutes and regulations establishing the particular relationship between the government and the Indians to determine whether they "give the Federal Government full responsibility to manage Indian resources and land for the benefit of the Indians." 103 S.Ct. at 2972. Finding that they did so, the court concluded, "they thereby establish a fiduciary relationship and define the contours of the United States' fiduciary responsibilities." *Id.*

Even though the use of the term "trust" is not essential, it is part of what may and should be considered in determining whether or not Congress intended that a trust be established. As stated above, in order to determine if Congress intended to create a trust, the first step is a careful analysis of the Utah Enabling Act.

The starting point of any consideration of this question must be the federal grants themselves, for it is clear that the interest transferred to the State depends on the federal laws that transferred that interest. *See California ex rel. State Lands Comm'n v. United States,* 457 U.S. 273, 279, 102 S.Ct. 2432, 73 L.Ed.2d 1 (1982) (citing *Borax Consolidated v. City of Los Angeles,* 296 U.S. 10, 22, 56 S.Ct. 23, 29, 80 L.Ed. 9 (1935)). If federal law provided for the transfer of an absolute fee interest, the lands are owned outright by the State. On the other hand, if the federal law created a trust with the State as trustee, the State is bound to comply with the terms of that trust.

*B.H. Papasan v. Allain,* 478 U.S. 265, 292 n. 18, 106 S.Ct. 2932, 92 L.Ed.2d 209 (1986). The language set forth in Section 12 of the Utah Enabling Act does not establish a trust

relationship between the State and the disabled miners. The Utah Enabling Act does not use the term "trust" in describing the land grants. Although the absence of the term trust does not necessarily mean that a trust does not exist, when combined with the language that does appear in the Enabling Act it follows to reason that Congress did not intend for a trust to be established. It is well established that there is a strong presumption that the plain language of the statute expresses Congressional intent. *See Ardestani v. Immigration & Naturalization Services,* 502 U.S. 129, 130, 112 S.Ct. 515, 116 L.Ed.2d 496(1991); *Rubin v. United States,* 449 U.S. 424, 430, 101 S.Ct. 698, 66 L.Ed.2d 633 (1981). The pertinent language of Section 12 of the Utah Enabling Act reads as follows:

> ... **for a miners' hospital for disabled miners, fifty thousand acres.** The United States penitentiary near Salt Lake City and all lands and appurtenances connected therewith and set apart and reserved therefor are hereby granted to the State of Utah.
>
> The said State of Utah shall not be entitled to any further or other grants of land for any purpose than as expressly provided in this Act; **and the lands granted by this section shall be held, appropriated, and disposed of exclusively for the purposes herein mentioned, in such manner as the legislature of the State may provide.**

(emphasis added). Although the Enabling Act states that the lands shall be "disposed of exclusively for the purposes herein mentioned", it goes on to say "in such a manner as the legislature of the State may provide." This language gives the legislature wide discretion in its use of the lands granted by Section 12. Because Congress gave the State wide discretion in the manner in which the funds would be disposed of, the plain language of the statute does not create a trust in the traditional sense. This court would agree that the lands granted for a miners' hospital should not be used for a prison or a park or for that matter even a hospital that charged disabled miners for treatment in the same manner it charged all of its patients.[1] However, the manner in

---

1. Even though these purposes are clearly con-    trary to the purpose set forth by Congress in the

which the State chooses to accommodate disabled miners is left to the discretion of the legislature under the Utah Enabling Act. This court agrees with the State that the intent of Congress was not to create enforcement rights in disabled miners, but to fund institutions. The fact that the legislature chose to use the funds for a rehabilitation center which treats other people in addition to miners is allowable. So long as disabled miners can use the center free of charge then the purpose of the grant has been complied with.

### B. *Article XX of the Utah Constitution*

■ The United Mine Workers argue that even though the Utah Enabling Act does not specify that a trust is created for the benefit of disabled miners, when read in conjunction with Article XX of the Utah Constitution it becomes clear that the State accepted the land with the intent to hold it in trust for the benefit of disabled miners. Article XX of the Utah Constitution reads as follows:

> All lands of the State that have been, or may hereafter be granted to the State by Congress, and all lands acquired by gift, grant or devise, from any person or corporation, or that may otherwise be acquired, are hereby accepted, and declared to be the public lands of the State; and shall be held in trust for the people, to be disposed of as may be provided by law, for the respective purposes for which they have been or may be granted, donated, devised or other wise acquired.

This court would agree that on first blush it appears that Article XX may create a trust whatever the terms of the Enabling Act. However, the language of Article XX does not create a trust for the benefit of disabled miners. Although Article XX does state that acquired lands shall be held "in trust for the people," it goes on to state that the lands shall "be disposed of as may be provided by law." The controlling language is "as may be provided by law". The language is consistent with the Utah Enabling Act which provides that the lands may be used "in such manner as the legislature of the State may provide". Both the Enabling Act and Article

XX give the State wide discretion in the manner in which it will dispose of and use the funds and neither creates a trust.

### C. *United States v. New Mexico*

The plaintiffs in this matter argue that this case is analogous to the Tenth Circuit decision in *United States v. New Mexico*, 536 F.2d 1324 (10th Cir.1976), and therefore a trust must exist. In the *New Mexico* case the United States brought an action seeking enforcement of the trust provisions of land grants of 100,000 acres made to New Mexico by Congress for a miners' hospital for disabled miners. Twenty eight disabled miners and the United Mine Workers intervened in this action as representative beneficiaries. As in Utah, New Mexico was given 50,000 acres of federal land for a miners hospital under the 1898 Ferguson Act, and an additional 50,000 acres under the New Mexico Enabling Act. Unlike Utah, New Mexico actually had a miners' hospital.

> Until 1968 Miners' Hospital was administered by a separate board of trustees and all revenues accruing from its four trust funds established in 1917 were maintained in a separate trust account. In 1968 New Mexico consolidated the administration of its hospitals, giving control of all state hospitals to the New Mexico Hospitals and Institutions Department. (HID). Pursuant to this reorganization all of the assets and control of Miners' Hospital went to HID. The separate account for trust revenues was closed by HID in 1969 and its revenues were commingled with all other HID income received from other state hospital facilities and institutions. HID also transferred equipment and supplies from Miners' Hospital to other institutions without charge.

> In 1971 HID changed Miners' Hospital from a "General and Special Chronic Hospital" to an intermediate care facility, the basic distinguishing characteristic between the two being that the latter institution does not provide surgical care. After the change HID ceased to acquire hospital equipment and make capital improvements

---

Utah Enabling Act, the issues of standing, right to sue, nature and identity of potential beneficiaries and potential issues relating to laches, waiv-

er, estoppel and statute of limitations would still need to be addressed.

which were necessary in order for Miners' Hospital to retain its accreditation as a general hospital. As a result Miners' Hospital did lose its accreditation in 1971 and thereafter eligible miners who were in need of health services not available at Miners' Hospital were admitted at other accredited general hospitals, the payment for such care being charged to the income from Miners' Hospital trust funds.

*Id.* 536 F.2d at 1326. The Tenth Circuit applied a narrow interpretation of the terms of the New Mexico Enabling Act and affirmed the district court holding that a trust did exist for the benefit of the disabled miners and that the funds must be used for a full care, licensed miners' hospital. The key difference between this case and the *New Mexico* case can be found in the states respective Enabling Acts. Section 7 of the New Mexico Enabling Act states that "the following grants of lands are hereby made, to wit: ... for miners' hospital, for disabled miners, fifty thousand acres." New Mexico Enabling Act of July 20, 1910, Chapter 310, § 7 (336 Stat. 557). However, Section 10 of the New Mexico Enabling Act states as follows:

> That it is hereby declared that **all lands hereby granted, including those which, having been heretofore granted to the said Territory, are hereby expressly transferred and confirmed to the State, shall be by the said State held in trust, to be disposed of in whole or in part only in manner as herein provided and for the several objects specified in the respective granting and confirmatory provisions,** and that the natural products and money proceeds of any of said lands shall be subject to the same trusts as the lands producing the same.
>
> Disposition of any of said lands, or of any money or thing of value directly or indirectly derived therefrom, for any object other than that which such particular lands, or the lands from which such money or thing of value shall have been derived, were granted or confirmed, or in any manner contrary to the provisions of this Act, **shall be deemed a breach of trust.**

*Id.* at Section 10. The New Mexico Enabling Act goes on to place a number of restrictions on the use of the land grants. Specifically, the land cannot be mortgaged or encum-

bered; the land can only be sold or leased to the highest bidder at a public auction; notice of sale of the land must be published in the newspaper for 10 weeks; the land cannot be sold for less than appraisal; New Mexico must retain legal title until purchaser pays full purchase price for the land; the land can not be sold for less than its minimum price specified in the act; a separate fund is to be established for each grant; the treasurer shall keep all moneys invested in safe interest-bearing securities which shall be approved by the governor and secretary of the state and shall at all times be under a good and sufficient bond or bonds; any disposition of the lands not in conformity with the provisions of the Act shall be null and void and it shall be the duty of the United States Attorney General to enforce the provisions of the Act.

The New Mexico Enabling Act is much more extensive and much more restrictive than the Utah Enabling Act. Further, the New Mexico Enabling Act actually specifies clearly that the lands shall be held in trust and further, it does not give any discretion whatsoever to the New Mexico legislature. A description of the history of the New Mexico Enabling Act supports the conclusion that there is a vast difference between New Mexico's and Utah's Enabling Acts. The Enabling Acts of New Mexico and Arizona "marked a complete and absolute departure from the enabling acts under which other states were admitted to the Union." *Murphy v. State,* 65 Ariz. 338, 181 P.2d 336, 344 (1947). Twenty-three of the first forty eight states were admitted to the Union without enabling acts. "Of these twenty-three, thirteen were the original states that formed the Union. The next ten appear to have simply "mushed" in." *Id.* The next twenty-three states were admitted though acts of admission, organic acts or enabling acts. The acts of these states are all very similar.

> [W]here land was granted by the United States to the state for various purposes the acts of admission, the organic acts, or the enabling acts as passed by Congress were each specific as to the purpose for which the land was granted, but all left to the legislatures of the states full power and authority to determine how the granted

lands were to be sold or leased and how and by whom the moneys derived from disposition of the lands were to be kept and preserved for the purposes for which the lands had been granted.

*Id.* The Utah Enabling Act is among these twenty-three acts. In these twenty-three states Congress did not designate anyone to keep invested funds derived from disposition of the granted lands. It was the experience of Congress in handling these states that led to the new policies of the New Mexico–Arizona Enabling Act.

> The dissipation of the funds by one device or another, sanctioned or permitted by the legislatures of the several states, left a scandal in virtually every state, and these granted lands and the monies derived from a disposition thereof were so poorly administered, so unwisely invested and dissipated, that Congress concluded to make sure, in light of experiences of the past, that such would not occur in the new states of New Mexico and Arizona.

*Id.* Of the first forty-eight states to enter the Union, only New Mexico and Arizona specify that lands are to be held in trust, to be disposed of only as therein provided and for the several objects specified. Further, only New Mexico and Arizona provide a list of restrictions such as those cited above. It is clear to this court that the intent of Congress changed dramatically from the time the Utah Enabling Act was passed to the time of passage of the New Mexico–Arizona Enabling Act. The changes made in the later Enabling Acts suggest that Congress believed lands granted to the earlier states were not being appropriately handled. In fact, this court would go so far as to say that the manner in which the State has used the funds designated for a miners' hospital is not ideal, and it is possible that Congress had something very different in mind. However, it is equally clear that at the time of the Utah Enabling Act Congress' intent was to give wide discretion to the state legislatures when it came to the disposition of funds and it was not the intent of Congress that the lands be held in trust. The fact that Congress later saw this as an error that needed to be corrected, does not change the fact that the Utah Enabling Act does not create a trust for the benefit of the disabled miners.

Many, if not all of the cases cited by the plaintiffs in support of their argument that a trust relationship exists, come out of Arizona and New Mexico or, as will be discussed in further detail below, interpret the designation of school trust lands. *Lassen v. Arizona,* 385 U.S. 458, 87 S.Ct. 584, 17 L.Ed.2d 515 (1967) interprets the Arizona Enabling Act and the restrictions it imposes on the use of trust lands. Even though the Arizona Enabling Act clearly designates a trust to be held for specific beneficiaries, the Supreme Court held that:

> The grant was plainly expected to produce a fund, accumulated by sale and use of the trust lands, with which the State could support the public institutions designated by the Act. It was not supposed that Arizona would retain all the lands given it for actual use by the beneficiaries; the lands were obviously too extensive and too often inappropriate for the selected purposes. Congress could scarcely have expected for example, that many of the 8,000,000 acres of its grant "for the support of the common schools," all chosen without regard to topography or school needs, would be employed as building sites. It intended instead that Arizona would use the general powers of sale and lease given it by the Act to accumulate funds with which it could support its schools.

*Id.* 17 L.Ed.2d at 519 Even in Arizona, which clearly has a more restrictive Enabling Act than does Utah, the State is given some discretion in the use of its land grants. It follows that under the Utah Enabling Act, and the wide discretion given to the state in comparison to Arizona, the manner in which the State used the land grants designated for a miners' hospital is acceptable. The Utah Supreme Court has recognized the difference between the Utah Enabling Act and the New Mexico and Arizona Enabling Acts. *National Parks & Conservation Assn. v. Board of St. Lands,* 869 P.2d 909 n. 3, Justice Durham's concurring opinion joined in by Justice Zimmerman (Utah 1993), addresses the transfer of school trust lands stating that "the most significant cases interpret and apply the New Mexico–Arizona Enabling Act of 1910, which contains specific provisions regarding disposition of trust lands and proceeds.... These

cases do not necessarily control interpretation of the Utah Enabling Act, which does not contain such provisions." *Id.* (citations omitted). It is clear to this court that given the differences between the Utah Enabling Act and the New Mexico Enabling Act, that the holding in *United States v. New Mexico* does not control in this matter.

### D. School Trust Lands

As stated above, many of the cases cited by the plaintiffs are cases which interpret the use of school trust lands. School trust land cases are unique and do not control here. There has been extensive litigation interpreting school trust lands and the duty imposed upon the State by the Enabling Act. The Utah Constitution places a number of restrictions on the use and management of school trust lands which do not apply to any other land grants. Section 10 of the Utah Enabling Act, which designates the "Permanent School Fund" states as follows:

> That the proceeds of lands herein granted for educational purposes, except as hereinafter otherwise provided, shall constitute a permanent school fund, the interest of which only shall be expended for the support of said schools, and such land shall not be subject to pre-emption, homestead entry, or any other entry under the land laws of the United States, whether surveyed or unsurveyed, but shall be surveyed for school purposes only.

The language of Section 10 of the Enabling Act is much more restrictive than the language of Section 12. Further, the State Legislature has assured that these lands are to be held in trust. Article X Section 5 of the Utah Constitution has been amended to establish a State School Fund and a Uniform School Fund. Section 5 goes on to designate where the revenues for these funds shall come from and further states that the State School Fund principal shall be safely invested and held by the state in perpetuity, that the interest received may be expended for the support of the public education system and that the Legislature "may make appropriations from school trust land revenues to provide funding necessary for the proper administration and management of those lands **consistent with the state's fiduciary re-**

**sponsibilities towards the beneficiaries of the school land trust."** (emphasis added).

In 1994 the State Legislature enacted the School and Institutional Trust Lands Management Act. The purpose of this act was to "establish an administration and board to manage lands that Congress granted to the state for the support of common schools and other beneficiary institutions." Utah Code Ann. § 53C–1–101. The act goes on to state that:

> (b) This grant was expressly accepted in the Utah Constitution thereby creating a compact between the federal and state governments which **imposes upon the state a perpetual trust obligation to which standard trust principles are applied.**
>
> (c) **Title to these trust lands is vested in the state as trustee to be administered for the financial support of the trust beneficiaries.**

*Id.* The Act goes on to impose fiduciary duties upon the state and to define the beneficiaries. The Utah State Legislature has made it clear that school trust lands are unique and that a trust exists with the State as trustee and the public education system and the institutions designated by the Utah Enabling Act as the beneficiaries.

Many of the cases cited by the plaintiffs in support of their argument are school trust land cases and do not apply to the case at hand. *See Duchesne County v. State Tax Commission,* 104 Utah 365, 140 P.2d 335 (1943); *Consolidation Coal Co. v. Utah Division of State Lands and Forestry,* 886 P.2d 514 (Utah 1994) and *Nat. Parks and Conservation Ass. v. Bd. of State Lands,* 869 P.2d 909 (Utah 1993). As stated above, school trust lands are unique and nothing in this opinion is intended to alter the manner in which school trust lands have been handled by the Utah State Legislature and by the Utah Supreme Court.

### E. Conclusion

Section 12 of the Utah Enabling Act does not create a trust relationship with the State as trustee and disabled miners as the beneficiaries. The Enabling Act gives wide discretion to the State to use the proceeds from the

land grants in the manner that it designates as appropriate. The University Rehabilitation Center provides care to disabled miners free of charge and this is sufficient compliance under the Utah Enabling Act. Article XX of the Utah Constitution does not create a trust but merely emphasizes that the land should be used in the manner provided by law. This case is distinguishable from *United States v. New Mexico* in that the New Mexico Enabling Act is vastly different from the Utah Enabling Act. Finally, school trust lands are unique in that they are held in trust pursuant to the Utah Enabling Act, the Utah Constitution and the School and Institutional Trust Lands Management Act and therefore the use of these land grants does not apply to Section 12 of the Enabling Act and the grants for a miners' hospital. Therefore, it is hereby

ORDERED that Plaintiffs' Motion for Partial Summary Judgment is DENIED and Defendants' Motion to Dismiss is GRANTED.