**Fred V. CHERRY**

v.

**The UNITED STATES.**

**No. 73–77.**

United States Court of Claims.

Feb. 21, 1979.

---

Kaletah N. Carroll, Fairfax, Va., attorney of record for plaintiff.

Frances L. Nunn, Washington, D. C., with whom was Asst. Atty. Gen. Barbara Allen Babcock, Washington, D. C., for defendant. Captain James R. Marshall, Washington, D. C., of counsel.

Before FRIEDMAN, Chief Judge, and NICHOLS and BENNETT, Judges.

ON DEFENDANT'S MOTION FOR SUM-
MARY JUDGMENT AND PLAIN-
TIFF'S CROSS MOTION FOR SUM-
MARY JUDGMENT

NICHOLS, Judge:

The parties have filed cross-motions for summary judgment. This case concerns the Air Force's disposition of the military pay and allowances of Colonel Fred Cherry. On October 22, 1965, Colonel Cherry was shot down while flying a combat mission over North Vietnam. Defendant seems to have been aware he was or might be alive, but communication with him was not possible. He remained a prisoner of war until February 12, 1973. Prisoners of war are entitled to regular pay and promotion, and during his period of imprisonment, Colonel Cherry earned $147,184.35 before taxes in basic pay and allowances. Such payments were kept in an account for him by the Air Force.

The Air Force disbursed to his then spouse, Shirley Ann Cherry (hereinafter wife), a k a Shirley Ann Brown Cherry Saunders, payments from this account for her support and for the support of their four children, to an extent that virtually depleted the account. Such payments defendant says were made pursuant to the Missing Persons Act, 37 U.S.C. §§ 551–558. The wife is a third party defendant, but her liability, if any, is not before us now.

The record indicates that Mrs. Cherry was not faithful to her husband while he was overseas, in that she had a child by another man while being supported by Colonel Cherry's military pay. After his return, Colonel Cherry divorced his wife on the grounds of adultery. Plaintiff alleges she was extravagant with his money and dissipated it without let or hindrance by the Air Force.

Colonel Cherry claims entitlement to funds transferred from his pay account to his then wife on two theories. First, he says that the Missing Persons Act is unconstitutional as it allows confiscation of his property without due process of law or procedural safeguards. If this claim is upheld, Colonel Cherry argues entitlement to $122,-098.13—his pay and allowances excluding taxes, monies Colonel Cherry admits he allotted to his wife, and the $4,720.98 he ultimately recouped upon his return. Colonel Cherry's alternative claim is that some payments to his wife were made illegally since the Air Force arbitrarily and capriciously failed to provide and follow adequate safeguards to insure that his interest, as well as those of his dependents, were being protected. Jurisdiction of this suit arises under 28 U.S.C. § 1491.

We do not find the Missing Persons Act unconstitutional, but we do hold that the Air Force owes Colonel Cherry part of the pay it allocated to the wife, since it has failed to demonstrate that Colonel Cherry's individual interest was properly protected when the Air Force administered his pay account, and indeed demonstrated the contrary with its own admissions.

I

The Missing Persons Act is a constitutional exercise of Congress' power "to make Rules for the Government and Regulation of the land and naval Forces." U.S. Const. art. I, § 8, cl. 14. The Act is one of many laws that effectuate the duty noted by Abraham Lincoln "to care for him who shall have borne the battle and for his widow, and his orphan." Abraham Lincoln, Second Inaugural Address (March 4, 1865).

The Act authorizes continuation of pay and allowances to members of the armed forces missing in action, 37 U.S.C. § 552, and allows the respective Armed Services' Secretaries or their designee to initiate, discontinue, or alter pay allotments authorized in advance by the serviceman for his dependents "when he considers it in the interest of the member, his dependents, or the United States · * * *." 37 U.S.C. § 553(e).

Certainly, this Act is intended to and does grant a great deal of discretion to the Secretary or his designee. But such discretion is constitutionally acceptable, especially in light of the legislative history of the Missing Persons Act and its predecessors. In 1942, the Committee on Naval Affairs

supported the predecessor of the present Act (50 U.S.C.App. § 1001) because it recognized that hardships occurred when missing servicemen had neglected to provide for their dependents via the allotment procedure established by the military. H.R.Rep. No.1680, 77th Cong., 2d Sess. 3, *reprinted in* [1942] U.S.Code Cong. Service 278–79; *Bell v. United States,* 366 U.S. 393, 408 (1961). And the present § 553(e), allowing the Secretary's (Air Force) alteration of allotments, was passed at a time when Congress often expressed concern for dependents of prisoners of war in North Vietnam who could not obtain necessary financial support due to bureaucratic red tape. 112 Cong. Rec. 20697, 20919, 21672 (1966) (all discussing problems faced by such dependents). Thus, it is clear that Congress desired and needed a flexible system to allow provision for dependents whose supporting members were separated from their families, not only geographically, but from any communication that would enable participation in the disbursement of their pay. Administrative discretion is needed to adjust to changing circumstances which are bound to occur over such a forced separation of many years. Concern for a family that might be in the deplorable shape of Colonel Cherry's did not require Congress to leave unprovided for the larger number, as one hopes, of families whose missing husbands would have bitterly resented red tape or obstruction interposed between their pay accounts and the dependents with need for support and care.

Yet the Secretary is not absolute in his discretion. He must make changes in the allotment of pay and allowances in the interest of "the member, his dependents, or the United States." 37 U.S.C. § 553(e). Such standards are specific enough to pass muster as a valid delegation of power by Congress, since the policy aim desired by Congress and the means to achieve these objectives have been clearly disclosed to the Armed Services in legislative debates concerning the Act and its predecessors, and in the language and standards of the Act itself. *Compare Lichter v. United States,* 334 U.S. 742, 783–86, 68 S.Ct. 1294, 92 L.Ed.

1694 (1948); *American Power and Light Co. v. SEC,* 329 U.S. 90, 105, 67 S.Ct. 133, 91 L.Ed. 103 (1946); *Grymes Hill Manor Estates v. United States,* 373 F.2d 920, 922–23, 179 Ct.Cl. 466, 469–72 (1967). For present purposes it suffices to note that the member's interests are of equal status with those of his dependents.

■ We also reject plaintiff's argument that disbursements to his then wife were made in a manner violative of due process. Congress passed the Missing Persons Act intending that the Secretary or his designee should administer funds in the best interest of members and dependents, in those very instances where notice to the serviceman and a hearing before disbursement of benefits to his family are impossible. Defendant made much of the absurdity of requiring that notice and an opportunity to be heard be given to a missing person who cannot be reached. We understood plaintiff's position really to be that a guardian ad litem should have been appointed to represent him, who could have received notice of any intended changes in his allotments. Clearly to do this would have much better respected the equality of treatment of servicemen, and dependents, as the statute implicitly requires, but we do not hold it is constitutionally necessary. The Act anticipates that the branch of the armed forces to which the serviceman belongs will scrutinize changes in his designated allotments to determine that any changes are warranted by the circumstances or essential for the well-being of his dependents. 37 U.S.C. § 553(b) and (h). And unlike the welfare recipients in *Goldberg v. Kelly,* 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1969), the serviceman's situation is not made immediately desperate by these disbursements, and on his return he can contest these payments, as Colonel Cherry is doing.

■ Finally, we disagree with Colonel Cherry's argument that since the State of Virginia, his domicile, generally provides for separation allowances of less than 100 percent of pay in divorce and separation

decrees, servicemen separated from their families when they are captured are denied equal protection because all of their pay may be allocated to their families. Certainly there is a difference between a divorce or separation where two branches of a family go their separate ways, and the forced separation in Colonel Cherry's case. When a serviceman is missing in action, there is still but one family, and the paycheck of that serviceman supports that one family. Thus, men separated from their families by decrees of divorce or separation are not similarly circumstanced as those who are separated due to war. The Missing Persons Act is not discriminatory in providing different standards for the class of missing servicemen. *Compare Puglisi v. United States,* 564 F.2d 403, 215 Ct.Cl. 86 (1977), *cert. denied,* 435 U.S. 968, 98 S.Ct. 1606, 56 L.Ed.2d 59, *rehearing denied,* 436 U.S. 951, 98 S.Ct. 2860, 56 L.Ed.2d 794 (1978).

The main reason why we think the statute is constitutional is that we read it as setting defendant's duties at a higher level than defendant does. If defendant were right about the nature of its statutory duties, the constitutionality of the statute would be dubious indeed.

## II

█ The Air Force fails to satisfy us that it seriously respected Colonel Cherry's own interests in administering his pay and allowances, despite its statutory responsibility to do so. The guardian ad litem notion is but one of the ways it could have done more than it did, and we can say it should have adopted some of them without having to specify which. The Air Force assumed the role of trustee for Colonel Cherry's pay and allowances—the Missing Persons Act and the Air Force regulations envision such a relationship, although the word "trustee" is not specifically used. That we see the high role of trustee as implicit in the statute is necessary to our viewing it as constitutional.

When an Air Force serviceman is reported missing in action, it is the Air Force which reports the occurrence to the family and continues to collect pay and allowances for its missing member. The Air Force sends the pay to the member's family, the amount depending on an allotment form signed by the serviceman before going into action. If changing circumstances warrant a change in the allotment, the Missing Persons Act allows the Secretary of the Air Force or his designee to make that change. 37 U.S.C. § 553(b) and (e). In addition, the Secretary is enabled to initiate, modify, or withdraw savings allotted to the Uniformed Services Savings Deposit Program, a savings program established for the benefit of servicemen overseas. 10 U.S.C. § 1035. Air Force policy encourages deposit of 10 percent of the pay of members missing in action so that they may have a nest egg upon their return; however, deposits may fall below this goal if emergencies arise. Thus, in these circumstances, the Air Force is acting as trustee for one who is unable to administer his own accounts due to forced absence and lack of communication.

█ It is not unusual for this court to recognize a trust relationship created by statutory duties flowing from one party to another. In *Mitchell v. United States,* 591 F.2d 1300 (Ct.Cl.1979), we noted that a fiduciary relationship between the United States and the Quinault Indian Tribe was expressly declared by statute in the General Allotment Act, 25 U.S.C. § 348, and therefore we determined that the tribe could recover compensation for breaches of that trust. We rejected defendant's jurisdictional argument based on the assertion that the Tucker Act does not consent to suit on equitable grounds such as trusteeship. *See also Mason v. United States,* 461 F.2d 1364, 1374, 198 Ct.Cl. 599, 617 (1972), *rev'd on other grounds,* 412 U.S. 391, 93 S.Ct. 2202, 37 L.Ed.2d 22 (1973), and *Fields v. United States,* 423 F.2d 380, 383, 191 Ct.Cl. 191, 196 (1970). Defendant will not, we think, allege that it owes servicemen missing in action a lower duty than it does an Indian, whose funds it manages in trust. In the present case, although the statute does not use the word "trustee," it is clear that the armed services have accepted the role of trustee

for their missing servicemen, with its attendant duties, including the obligation to account for breach of fiduciary duties. Technicalities of language or form are unnecessary to create a trust if the intent to create that trust, the res, and the beneficiaries are clearly set forth. *International Harvester Co. v. United States,* 342 F.2d 432, 437, 169 Ct.Cl. 821, 830–31 (1965). References to an "express trust" in that opinion are to distinguish that trust from a resulting trust: they do not mean the parties then used the word "trust" any more than Congress did here.

■ As the trustee of Colonel Cherry's account, the Air Force had a duty to insure that the interests of all the trust beneficiaries were equally weighed. And this is where it failed. The Air Force, through its regulations and practices, arbitrarily and capriciously settled on a policy of satisfying the more vocal demands of dependents as painlessly as possible for it and for the dependents, without consideration of the concerns of the absent and silenced serviceman. This was especially clear in Colonel Cherry's case. Letters from Mrs. Cherry requesting emergency funds were routinely granted for a variety of reasons: vacations, large amounts of cash stolen. All she had to do was to state her wants in writing. Such requests were granted despite the depletion of Colonel Cherry's savings, and despite the Air Force's policy of allocating 10 percent of a member's pay to savings, absent *emergencies.* Indeed, the record does not show a single instance in which the Air Force rejected a request for funds by the wife, no matter what reasons she assigned.

It is understandable and fitting given the policies of the Act that the Air Force did not demand that dependents prove "beyond a reasonable doubt" their entitlement to emergency funds or additional allotments. The Air Force was attempting to alleviate any financial worries encountered by servicemen's dependents at what was a very distressful period for those persons. But the Air Force had a duty to the servicemen also. Surely the Air Force was aware that not all dependents can wisely budget and

utilize the pay allocated them, especially if the missing servicemen ordinarily had handled family financial matters. And certainly the Air Force was aware that not all servicemen's wives remain loyal to their missing spouses during the long separations encountered in these circumstances. Indeed, the fact that the Air Force does discontinue allotments in the event of proved marital misconduct demonstrates this awareness.

The duty of supplying funds according to the beneficiary's need is common in testamentary and other privately created trusts, as well as in the Indian cases, but it never seems to have occurred to the Air Force, and it still does not occur to its counsel here, to look to law and practices that have developed in such cases for the standards it should have applied in administering the Missing Persons Act.

It is clear that at some point during Colonel Cherry's absence the Air Force did have a suspicion that Mrs. Cherry could be using the allotment given her unwisely, or even abusing her privileges. The Air Force claims it resisted investigating her marital misconduct despite a complaint and letter from Colonel Cherry's sister in 1972 because regulations forbade any investigation of marital misconduct until a written complaint was filed against the dependent, with documentary substantiation. The intent of the regulation is understandable: to prevent unfounded gossip from placing a dependent and her family in constant scrutiny. But it places too great a burden on the absent servicemen to use such a requirement as an excuse to avoid inquiry, when other circumstances point to the possibility that a spouse may be spending her allotments in ways that are inconsistent with the objectives of the Missing Persons Act. After all, the Air Force is required to protect Colonel Cherry's pecuniary interests while he is absent. It is not required to police the fidelity of his wife, but it is to disburse his pay account with some regard to what his wishes would probably be, were he in a position to state them.

We certainly would not demand a full scale investigation of the activities of every serviceman's spouse while he was missing in action, nor a proliferation of forms and proofs whenever an emergency request for funds is made by a serviceman's dependent, but we do find that in this case, the Air Force became at some point overeager to care for Mrs. Cherry's every want, and to protect her privacy, to the enormous disadvantage of Colonel Cherry, and in disregard of his claim to equal consideration of his pecuniary interests. For example, in January 1970, Mrs. Cherry requested, and received, emergency funds from the pay account for surgery in a private hospital, despite the fact that as a serviceman's wife she was entitled to free medical care at excellent military hospitals in the area. A proper trustee of Colonel Cherry's funds would not have casually accepted her explanation that "I was a little afraid," for such a costly expenditure. The record indicates that the operation in the private hospital was for delivery of an illegitimate child; had the Air Force merely inquired as to the nature of the surgery, it might have discovered this evidence of marital misconduct. Also, it was clear that in late 1971 Mrs. Cherry was avoiding the inquiries of the Air Force, which by this time had become concerned about her frequent and expensive emergency requests, yet despite this evident avoidance, payments continued.

Our inquiry on these cross-motions is as to entitlement. All we need to determine and do determine is that on the version of the facts most favorable to the Air Force, it has not properly performed its trustee duties and therefore is liable to the plaintiff in some amount. The determination of what amount is one of quantum and it may be made pursuant to Rule 131(c).

Given the sparse and confusing record before us on the parties' cross-motions for summary judgment, we cannot determine at what point the Air Force had learned enough to require it, as trustee, to investigate further Mrs. Cherry's expenditures or to stop allotments altogether. This will have to be determined on remand to the trial division. We merely hold that at some point in time the Air Force, acting as a conscientious trustee of Colonel Cherry's funds, should have undertaken an investigation of the manner in which they were expended and that Colonel Cherry is entitled to funds disbursed after that point, if further examination of the facts indicates that disbursements to Mrs. Cherry were made on the basis of false claims by her or were for non-emergency purposes or not warranted by the particular circumstances. Possibly the Air Force would have learned thus of earlier misstatements and been able to offset claims by it for refunds against current allotments.

Also, the Air Force has established some regulations for the administration of missing servicemen's pay accounts, and it may appear that these regulations have been violated in this case. We are informed by counsel for plaintiff that certain Air Force regulations exclude so-called "special pay" and flight hazard pay from allotments to dependents, but counsel fails to provide us with a text of that regulation, as required by Court of Claims Rule 124. In addition, there is a discrepancy in the record as to the percentage of his pay Colonel Cherry claims to have allotted to his wife. Colonel Cherry contends that the Air Force relied on a "Record of Emergency Data" that was not signed by him and that contained an alteration of the initial allocation he made to his wife in 1964. The form relied on by the Air Force, he argues, was typed and signed on October 25, 1965, three days after he was shot down. Whether the Air Force did violate its own regulations and thereby erroneously authorized payments to Mrs. Cherry also must be determined by the trial division.

Accordingly, defendant's motion for summary judgment is denied, and plaintiff's cross-motion for summary judgment is granted to the extent explained above. Plaintiff is entitled to recover any amounts owed him which defendant paid Mrs. Cherry in violation of its duty to administer the account of Colonel Cherry in his interest, equally with the interest of his dependents and the United States. The cause is re-

manded to the trial division for further proceedings under Rule 131(c) for a determination of the amount of recovery due plaintiff.

BENNETT, Judge, concurring and dissenting.

I agree that the Missing Persons Act is constitutional, although not because it creates a trust which it does not speak of and which cannot be implied from authorities relied upon by the court. These authorities require a contrary conclusion. I agree, also, that plaintiff in this case has been outrageously treated by defendant, as the opinion of the court so well points out. However, defendant's negligent performance of its responsibilities to plaintiff is a tort. This court has no primary tort jurisdiction. 28 U.S.C. § 1491. As much as I would like to correct the wrongs done to plaintiff by his Government, there is no authority in the Missing Persons Act for us to create a trust relationship from which that recovery can be derived, as the court postulates. Before addressing the latter point, however, a few observations about tort actions against the Government are in order.

The federal Tort Claims Act has a number of exceptions preventing such claims against the United States. 28 U.S.C. § 2680. Among those exceptions are:

(a) Any claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.

\* \* \* \* \* \*

(j) Any claim arising out of the combatant activities of the military or naval forces, or the Coast Guard, during time of war.

(k) Any claim arising in a foreign country.

It is clear from the foregoing that plaintiff cannot recover in a federal court on the claim he has presented. Certainly he is not entitled to recover in this court. "Congress has always withheld from this court and from the Tucker Act original jurisdiction over tort claims against the Government." *Eastport S.S. Corp. v. United States*, 372 F.2d 1002, 1010, 178 Ct.Cl. 599, 609 (1967). In *United States v. Neustadt*, 366 U.S. 696, 705, 81 S.Ct. 1294, 6 L.Ed.2d 614 (1961), the Supreme Court reversed the United States Court of Appeals for the Fourth Circuit which had ruled that "if the government assumes a duty and negligently performs it, a party injured thereby may recover damages from the United States \* \* \*." 281 F.2d 596, 599 (4th Cir. 1960). The Government's offense in that case was one of negligent misrepresentation in the making of a careless real estate appraisal. *See also Palcic v. United States*, 590 F.2d 344 (Ct.Cl.1979). The law of the land was succinctly stated in *Feres v. United States*, 340 U.S. 135, 141, 71 S.Ct. 153, 157, 95 L.Ed. 152 (1950), when the Supreme Court said: "We know of no American law which ever has permitted a soldier to recover for negligence, against either his superior officers or the Government he is serving."

The court nevertheless says that there is a trust here and cites its recent opinion in *Mitchell v. United States*, 591 F.2d 1300 (Ct.Cl.1979). But those cases do not at all support plaintiff's recovery here because in *Mitchell* there was an express trust created by statute. Here is what the court said in that opinion:

To sustain jurisdiction it is enough for us that *the General Allotment Act* [emphasis added], *supra,* governing the tracts involved in these cases, *expressly declares the fiduciary connection* [emphasis added]. Section 5, 25 U.S.C. § 348, states that the allotment-patents "shall be of the legal effect, and declare that *the United States does and will hold the land thus allotted, for the period of twenty-five years, in trust for the sole use and benefit of the Indian* \* \* \* and that at the expiration of said period the United States will convey the same by patent

to said Indian, or his heirs as aforesaid, in fee, discharged *of said trust* * * *." [Emphasis in original, except as noted.] [At 1302.]

The court then went on to say:

* * * There is no requirement that Congress say expressly that damages can be recovered for breach of the trust. [Footnote omitted.] That conclusion is the necessary inference from the statute. [At 1302.]

The court cited *Eastport S.S. Corp. v. United States, supra,* 372 F.2d at 1007, 178 Ct.Cl. at 605, as spelling out that a fair interpretation that the statute authorized monetary recovery is that it does so "expressly or by implication." That position has been approved by the Supreme Court in *United States v. Testan,* 424 U.S. 392, 96 S.Ct. 948, 47 L.Ed.2d 114 (1976).

The concurring opinion in *Mitchell* said:

* * * *If the United States declares itself by statute to be trustee* of another's property, it assumes in my view an obligation to respond monetarily, in an action *not sounding in tort,* for maladministration of the property that deprives the beneficiary of its value. [Emphasis added.] [At 1306.]

The court has not pointed to any passage in the Missing Persons Act which creates "expressly or by implication" the statutory authorization for a trust, which it required in *Mitchell* as the "substantive right" which mandates compensation. It is very important to note in this connection that in *Mitchell* the holding that the statute authorized suit for monetary recovery was based on an implication which derived from the statute's express declaration of a trust. It is the absence of the latter which here deprives the court of the analogy it seeks to establish. In its understandable desire to grant relief to plaintiff for the Government's gross negligence in handling his affairs, the court has rested its decision on what in *Mitchell* it described as "unanchored judge-created principles of fiduciary law." The appropriate procedure would be for this plaintiff to seek from Congress a private relief bill or a congressional reference under 28 U.S.C. § 2509.

The court cites three other cases, likewise inapposite as to the implied trust relationship, upon which it predicates its holding. In *Mason v. United States,* 461 F.2d 1364, 198 Ct.Cl. 599 (1972), *rev'd on other grounds,* 412 U.S. 391, 93 S.Ct. 2202, 37 L.Ed.2d 22 (1973), recovery was allowed on the grounds that there was a breach of trust by the United States growing out of an express trust created by the Osage Allotment Act of 1906, 34 Stat. 539, as amended. To this extent the *Mason* case is like the *Mitchell* decision. In *Fields v. United States,* 423 F.2d 380, 191 Ct.Cl. 191 (1970), another Indian claim, the court relied on an implied contract theory not raised or relied upon by the court in the instant case. *International Harvester Co. v. United States,* 342 F.2d 432, 169 Ct.Cl. 821 (1965), was also a contract case. There plaintiff had improperly retained some funds turned over to it by its subcontractor under what the court found to be an express trust. The issue in the case was whether or not the Government could reach those funds by a setoff for taxes. Nowhere in these cases, in the statutes, or in Air Force regulations, has the court identified authority for a trust theory to surmount the obstacles created by statute, quoted above, explicitly barring tort claims against the Government by members of the military service.

If this is a harsh result on the appealing circumstances of Colonel Cherry's case, it must be remembered that there is just not a judicial remedy for each and every wrong that takes place in our society. When there are remedies, they are sometimes, as here, matters for legislative discretion, not judicial activism. Such wrongs are ghosts in the law which the court now would slay with weapons not given to it but belonging to others vested with the exercise of political judgments.