Chloe WHISKERS, Annie Cantsee, Velma Mills, James Mills, Marshall Whyte, Raymond Stewart Hatch and Anna Marie Nat, Plaintiffs-Appellants,

v.

UNITED STATES of America, Cecil Andrus, Secretary of the Interior, and Forrest Gerard, Assistant Secretary of the Interior for Indian Affairs, Defendants-Appellees.

Quinault Allottees Association, Amicus Curiae.

No. 77–1620.

United States Court of Appeals, Tenth Circuit.

Argued Sept. 29, 1978.

Decided June 14, 1979.

Rehearing Denied Aug. 14, 1979.

Thomas E. Luebben, Albuquerque, N.M. (Richard Hughes, Window Rock, Ariz., Eric Swenson, Mexican Hat, Utah, and Parker M. Nielson, Salt Lake City, Utah, on the brief), for plaintiffs-appellants.

Larry G. Gutterridge, Dept. of Justice, Washington, D.C. (James W. Moorman, Asst. Atty. Gen., Washington, D.C., Ronald L. Rencher, U.S. Atty., and Steven W. Snarr, Asst. U.S. Atty., Salt Lake City, Utah, and Jacques B. Gelin, Dept. of Justice, Washington, D.C., on the brief), for defendants-appellees.

Amicus Curiae brief on behalf of The Quinault Allottees Ass'n filed by Charles A. Hobbs, Washington, D.C. (Jerry R. Goldstein and Robin A. Friedman, Washington, D.C., of counsel), of Wilkinson, Cragun & Barker, Washington, D.C.

Before McWILLIAMS, McKAY and LOGAN, Circuit Judges.

McKAY, Circuit Judge.

This litigation arises out of a settlement between the United States and the Southern Paiute Nation to compensate the latter for the taking of aboriginal homelands in southern Utah and northern Arizona.[1] In 1965 Congress appropriated more than seven million dollars to pay the settlement sum. Second Supplemental Appropriations Act, Pub.L. No. 89–16, tit. IV, 79 Stat. 108 (1965) (the Appropriation Act).[2] The Southern Paiute Judgment Distribution Act, Pub.L. No. 90–584, 82 Stat. 1147 (1968) (the Distribution Act) was enacted three years later to provide for distribution of the judgment fund.

The Distribution Act directed the Secretary of the Interior (the Secretary) to prepare a roll of all persons who met the requirements of membership in six specified groups or categories of Southern Paiutes.

---

1. The settlement was stipulated to before the Indian Claims Commission.

2. Title IV of Pub.L. No. 89–16 appropriated money "[f]or payment of claims . . . as set forth in Senate Document Numbered 19, Eighty-ninth Congress and House Document Numbered 113, Eighty-ninth Congress." The House Document referred to seven Indian Claims Commission awards, including the instant one in favor of "The Southern Paiute Nation et al." H.R. Doc. No. 113, 89th Cong., 1st Sess. 15 (1965).

Applications for inclusion on the roll were required to be filed in the manner and within the time limits prescribed by the Secretary, whose determination on all applications was to be final. After deducting expenses, the Secretary was directed to apportion the remainder of the fund among the six groups of persons entitled to enrollment.

Regulations promulgated by the Secretary pursuant to the Distribution Act repeat the eligibility requirements outlined in the act and further require that applications for enrollment be postmarked by June 30, 1969. 25 C.F.R. § 41.3(*l*)(1)–(4) (1978).

Plaintiffs brought this suit for damages in federal district court contending that the United States made inadequate attempts to enroll eligible persons residing in remote areas, which caused plaintiffs and the class they represent to fail to receive their rightful shares of the settlement. Plaintiffs' district court complaint, as amended, denominated five causes of action:

(1) breach of a trust created by the Distribution Act and regulations promulgated thereunder;

(2) breach of a trust created by general federal Indian statutes, regulations and judicial decisions;

(3) breach of statutory duties established by the Distribution Act;

(4) taking of property without just compensation, in violation of the Fifth Amendment; and

(5) deprivation of property without due process of law.

Plaintiffs asserted that the district court had jurisdiction over these claims by virtue of a provision of the Tucker Act, 28 U.S.C. § 1346(a) (1976), which provides:

(a) The district courts shall have original jurisdiction, concurrent with the Court of Claims, of:

. . . . .

(2) Any . . . civil action or claim against the United States, not exceeding $10,000 in amount, founded either upon the Constitution, or any Act of Congress, or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort.

The district court concluded that its Tucker Act jurisdiction did not extend to any of the claims alleged in plaintiffs' complaint. The court was of the view that the Distribution Act did not establish a trust or create other substantive rights in the plaintiffs that were enforceable under the Tucker Act, and accordingly dismissed the first and third causes of action. The second cause of action was dismissed on the ground that an action for breach of trust was beyond the district court's Tucker Act jurisdiction. The court further concluded that plaintiffs did not enjoy a property right in the judgment fund cognizable under the Fifth Amendment and therefore dismissed the fourth and fifth causes of action. Whether dismissal of plaintiffs' complaint as to each of these claims was proper is the only issue on appeal.

## I.

■■■ We begin our review of the trial court's disposition by noting that through the Tucker Act the United States has consented to be sued in the district courts and the Court of Claims for money damages arising out of certain specified circumstances. 28 U.S.C. §§ 1346(a)(2), 1491 (1976). *See United States v. Sherwood,* 312 U.S. 584, 590, 61 S.Ct. 767, 85 L.Ed. 1058 (1941); *International Engineering Co. v. Richardson,* 167 U.S.App.D.C. 396, 512 F.2d 573, 577 (1975), *cert. denied,* 423 U.S. 1048, 96 S.Ct. 774, 46 L.Ed.2d 636 (1976); *Pasha v. United States,* 484 F.2d 630, 633 (7th Cir. 1973); *Konecny v. United States,* 388 F.2d 59, 62 (8th Cir. 1967). However, the act itself does not provide any substantive rights enforceable against the United States in a suit for damages; it merely confers jurisdiction

whenever such a substantive right falling within the categories enumerated in the Tucker Act otherwise exists. *United States v. Testan*, 424 U.S. 392, 398, 96 S.Ct. 948, 47 L.Ed.2d 114 (1976). It is not enough that a complaint contain allegations comporting with Tucker Act claim categories. The Supreme Court in *Testan* made it clear that before a court may hear a Tucker Act claim against the United States, it must first determine that some "federal statute[3] 'can fairly be interpreted as mandating compensation by the Federal Government for the damage sustained.'" 424 U.S. at 400, 96 S.Ct. at 954 (quoting *Eastport Steamship Corp. v. United States*, 178 Ct.Cl. 599, 372 F.2d 1002, 1009 (1967)).

■ Since plaintiffs' claims are premised on the Constitution, federal statutes, and executive regulations, they are within the specific categories enumerated in the Tucker Act. Inasmuch as the Distribution Act gave plaintiffs the right to share in the judgment proceeds,[4] the controlling question is whether federal law mandates compensation for damages plaintiffs may have sustained because of the Secretary's actions in derogation of their rights.

## II.

■■ Our analysis of the question focuses first on the breach of trust claims. At the outset we express our full agreement with plaintiffs' contention that a legislative declaration of trust status for a particular fund is itself a congressional mandate, fully consistent with the *Testan-Eastport* standard discussed above, that the United States assume financial responsibility for its failure adequately to perform its fiduciary obligations.[5] Liability on the part of a trustee for breach of his fiduciary duties is inherent in a trust relationship. Unless it appeared affirmatively that Congress meant to create something less than a trust relationship when it used the term "trust" in referring to a particular fund, we would necessarily assume that Congress intended to establish nothing less than a valid trust—complete with fiduciary duties and concomitant financial liability for their breach. That congressional creation of a trust relationship itself mandates compensation for damages sustained from breach of that trust has recently been recognized by the Court of Claims in a decision involving amicus Quinault Allottees Association. *See Mitchell v. United States*, 591 F.2d 1300, 1302 (Ct.Cl.1979).[6]

■ While we accept plaintiffs' basic jurisdictional premise, we cannot agree that Congress in any way indicated that the judgment fund in question was to be held in trust pending distribution or that the Secretary was to act as a trustee in distributing the fund.

The Appropriation Act did not indicate that the fund would be held in trust pend-

---

**3.** For purposes of this determination, an "authorized regulation" is the equivalent of a statute. *See United States v. Hopkins*, 427 U.S. 123, 128, 96 S.Ct. 2508, 49 L.Ed.2d 361 (1976) (per curiam).

**4.** Plaintiffs all claim to be within the sixth category of Southern Paiutes listed in the Distribution Act. This category consists of "Indians living [other than in previously mentioned areas] who can establish Southern Paiute lineal descent to the satisfaction of the Secretary of the Interior." Pub.L. No. 90–584, § 1(g), 82 Stat. 1147.

**5.** We do not believe *Testan* requires that Congress expressly state that damages are recoverable before jurisdiction under the Tucker Act will lie. *See Mitchell v. United States*, 591 F.2d 1300, 1302 (Ct.Cl., 1979). The *Eastport* deci-

sion noted that the right to monetary recovery could be granted "expressly or by implication." 178 Ct.Cl. 599, 372 F.2d at 1007.

**6.** The conclusion that the Tucker Act provides a jurisdictional basis for claims alleging breach of a congressionally created trust is by no means novel. In *United States v. Mason*, 412 U.S. 391, 93 S.Ct. 2202, 37 L.Ed.2d 22 (1973), the Supreme Court reversed a Court of Claims determination that the United States, acting as trustee, had breached its fiduciary responsibilities with respect to Indian property. The Court did not, however, question the Court of Claims' conclusion that the Tucker Act was a proper jurisdictional basis for bringing such a claim. *See* 412 U.S. at 394 n. 5, 93 S.Ct. 2202.

ing distribution. *See* Pub.L. No. 89–16, tit. IV, 79 Stat. 108. Neither did the Distribution Act.[7] *See* Pub.L. No. 90–584, 82 Stat. 1147. Plaintiffs refer to several statutes concerning trusts, but none has applicability to the fund in question. *E. g.,* 25 U.S.C. § 160 (1976) (concerning stocks, bonds, and other securities held by the Secretary for certain Indians on June 10, 1876); 25 U.S.C. § 161 (1976) (Secretary authorized to deposit into the Treasury certain funds held by him as trustee on April 1, 1880); 31 U.S.C. § 547a (1976) (investment procedure for trust funds).

Plaintiffs place substantial reliance on 31 U.S.C. § 725s(a)(20) (1976),[8] contending it declares that the judgment fund, while held in the Treasury pending distribution, was held in trust. At first blush, the section does appear to have the effect plaintiffs attribute to it. Although the government inexplicably makes no attempt to refute the claimed significance of the section, our independent research leads us to conclude that the section does not have the sweeping meaning that a simple reading of it might indicate.

Section 725s provides:

> (a) The funds appearing on the books of the Government and listed in subsections (b) and (c) of this section shall be classified on the books of the Treasury as trust funds. . . .

> .    .    .    .    .

> (20) Indian moneys, proceeds of labor, agencies, schools, and so forth (5t301).

The key to understanding the scope of subsection 20 is found in the rather cryptic parenthetical notation "(5t301)." This notation refers to the particular Treasury account to which the specified funds were credited. 78 Cong.Rec. 8242 (1934) (remarks of Rep. Griffin). The funds so credited were described as follows:

> This fund covers deposits in the Treasury of the United States of proceeds of pasturage and sales of timber, coal, or other products and miscellaneous revenues of any Indian reservation, except those of the Five Civilized Tribes, and not the result of the labor of any one member of a tribe.

Hearing on H.R. 9410 Before the Subcomm. on Permanent Appropriations of the House Appropriations Comm., 73d Cong., 2d Sess., 255 (1934). The Chief Finance Officer of the Indian Service further explained:

> In the negotiation of the treaties with the several tribes of Indians, tracts of land were set aside for agencies, schools, and administrative purposes. Frequently the Indians were compensated in some way for the land so held. The title to the land is vested in the United States. There were set aside anywhere from 160 to 640 acres of land, all of which is not needed. Some of that land may be leased for grazing purposes, the agency may operate a farm on it, or the land may be put to some other use. The revenue derived from that land comes in, not to the credit of the tribe, but is taken up in the account as "Indian Moneys, Proceeds of Labor", and is available for expenditure by the several schools or agencies.

*Id.* at 258 (testimony of Mr. Dodd).

It is clear that this provision dealt only with a narrow range of "Indian moneys," and not with all funds that might be so described. It is equally clear that funds appropriated in settlement of claims brought before the Indian Claims Commis-

---

**7.** The only express mention in the Distribution Act of a trust relationship is in section 6. That section merely authorizes the Secretary to establish trusts in favor of individual enrollees under certain circumstances:

> Sums payable to enrollees or their heirs or legatees who are less than twenty-one years of age or who are under a legal disability shall be paid in accordance with such procedures as the Secretary determines will best protect their interests, including the establishment of trusts.

**8.** This provision was enacted by the Permanent Appropriation Repeal Act of 1934, Pub.L. No. 73–473, § 20, 48 Stat. 1233.

sion are not within that narrow range. It follows that this section provides no basis for concluding that the judgment proceeds were held in trust at the time they were distributed by the Secretary.

Plaintiffs advance the further argument that an analysis of the existing body of law and regulations applicable to Indians, taken as a whole, supports the conclusion that the relationship of the United States to its Indian citizens is in the nature of a trust. This point is not without some appeal and, indeed, it is entirely accurate as a general proposition. But this characterization simply does not satisfy the *Testan-Eastport* requirement of a specific congressional mandate to compensate those injured by the violation of some substantive right.

For the reasons outlined in this opinion, we agree that plaintiffs' breach of trust claims were properly dismissed.[9] In so deciding, we are not unmindful of language in *Cheyenne-Arapaho Tribes v. United States*, 512 F.2d 1390, 1392 (Ct.Cl.1975), "that funds appropriated to Indians to satisfy judgments of the Indian Claims Commission or of [the Court of Claims], as well as funds produced by tribal activities, are, when kept in the Treasury, held in trust for the Indians." The *Cheyenne-Arapaho* case involved several types of trust funds, including two held by the Southern Ute Tribe which were derived from an Indian Claims Commission award. That case is readily distinguishable from this one, however, in that specific congressional legislation declared the funds in *Cheyenne-Arapaho* to be held in trust.[10] In any event, insofar as the cited language in *Cheyenne-Arapaho* would lead us to a conclusion incompatible with the standards

9. The parties devote some attention to 28 U.S.C. § 1346(a)'s grant of jurisdiction over claims against the United States "for liquidated or unliquidated damages in cases not sounding in tort." Even assuming an action for breach of trust fits within this category of claim—which it certainly seems to do—appellants must still demonstrate the existence of the requisite congressional intention that monetary compensation be available for violation of a substantive right. We have stated that congressional establishment of a trust itself satisfies this requirement for claims based on breach of that trust. No such establishment of a trust has been demonstrated by plaintiffs in this case.

This problem may be of no more than theoretical interest in any event. Any congressional creation of a trust would be accomplished directly, by statute, or indirectly, by authorized regulation. An action for breach of that trust would therefore readily fit within the "Act of Congress" and "regulation of an executive department" prongs of the Tucker Act, making resort to the more amorphous "cases not sounding in tort" category unnecessary.

10. 25 U.S.C. § 672, enacted in 1951, divided certain trust funds, giving a portion to the Southern Utes. That statute directed that this portion be credited to the Southern Utes' "existing" trust account established pursuant to other provisions of Title 25. When Congress ordered distribution of the Indian Claims Commission award forming the trust res at issue in *Cheyenne-Arapaho*, it simply directed that the judgment share attributable to the Southern Utes be "available for use in accordance with existing authorization," including § 672. 25

U.S.C. § 676a (1976). Moreover, Congress expressly referred to the Southern Utes' judgment award as constituting a trust fund. *Id.* Thus there was present in the *Cheyenne-Arapaho* case precisely what is missing in this case—a specific congressionally created trust relationship from which a congressional mandate for compensatory damages for breach of trust can be fairly implied.

We recognize that § 676a refers to "the trust fund . . . appropriated by the Second Supplemental Appropriations Act, 1965." This act, of course, also appropriated the sum to pay the Southern Paiute award involved in the instant case. The fact that the Appropriation Act does not itself refer to trust funds being appropriated and the absence in the Southern Paiute Distribution Act of any reference to a pre-distribution trust relationship nonetheless compel the conclusion that the quoted phrase in § 676a refers only to the Ute award dealt with by that section, and not to the Southern Paiute award. Our comprehensive review of the legislative history of § 676a indicates there is no basis for concluding that Congress meant to express its intention that *all* sums appropriated by the Appropriation Act, including those in no way expressly affected by § 676a, were to be held as trust funds. In this regard, a comparison of § 676a with the Distribution Act is insightful: While § 676a, dealing with Southern Utes, refers to "the *trust fund* . . . appropriated by the Second Supplemental Appropriations Act," § 1 of the Distribution Act, dealing with Southern Paiutes, refers to "the *sum* . . . appropriated [by that same appropriation act]." (Emphasis added.)

announced in *Testan*, we are unable to follow it.

Plaintiffs have also drawn our attention to two cases decided by the Court of Claims subsequent to its decision in *Mitchell*.[11] Both decisions, *Duncan v. United States*, 597 F.2d 1337 (Ct.Cl.1979), and *Cherry v. United States*, 594 F.2d 795 (Ct.Cl.1979), concluded that Tucker Act jurisdiction existed for breach of trust claims presented by plaintiffs in those cases.

■ In *Cherry*, the court reasoned that a statute and related regulations "envision[ed]" a trust relationship between the Air Force and missing Air Force personnel insofar as management of compensation accruing to servicemen missing in action was concerned. 594 F.2d at 799. This result was reached despite the absence of the word "trustee" in the provisions relied on. We agree that use of the word "trustee" is not absolutely essential to the finding of a trust relationship when it is otherwise clear that Congress intended a trust relationship to exist.[12] But even if the Court of Claims was correct in discerning a trust relationship in the provisions considered in *Cherry*, we are unable to reach a similar conclusion in the case before us. We simply do not find in the relevant statutory and regulatory provisions an enumeration of duties which would justify a conclusion that Congress intended the Secretary to be a trustee in carrying out the provisions of the Distribution Act.[13]

In *Duncan*, the court cited *Cherry* for the proposition that "Congress need not expressly use a talismanic phrase such as 'trust relationship' or 'hold in trust' in order to establish a trust relationship." 597 F.2d at 1342. However, the case was like *Mitchell*—and unlike *Cherry*—in that it involved a statutory provision which explicitly recognized the existence of a trust relationship. *See id.* at 1343.

Whether or not these cases are at variance with *Testan* is not clear. Insofar as they are, we of course cannot follow them. Insofar as they are not, they do not require a conclusion different from the one we have reached here.

### III.

■ Plaintiffs' third cause of action was properly dismissed. This cause of action was based on alleged breach of statutory duties established by the Distribution Act, independent of any trust relationship. The requisite mandate of federal compensation for damages sustained is not to be found in these provisions. *See United States v. Testan*, 424 U.S. at 400, 96 S.Ct. 948.

### IV.

■ Plaintiffs' constitutional claims in counts 4 and 5 were also properly dismissed. We agree with the trial court's conclusion that plaintiffs had no constitutionally cognizable individual property rights in the undistributed fund of which they could have been deprived in violation of the Fifth Amendment.

> The court has not pointed to any passage in the Missing Persons Act which creates "expressly or by implication" the statutory authorization for a trust which it required in *Mitchell* as the "substantive right" which mandates compensation. It is very important to note in this connection that in *Mitchell* the holding that the statute authorized suit for monetary recovery was based on an implication which derived from the statute's express declaration of a trust. It is the absence of the latter which here deprives the court of the analogy it seeks to establish. *Id.* at 803.

---

**11.** See text accompanying note 6 *supra*.

**12.** By the same token, as noted earlier in this opinion, mere use of the term "trust" would not *necessarily* justify a conclusion that an actual trust relationship had been intended by Congress. *See* text following note 5 *supra*.

**13.** It should be noted that a panel member dissented in *Cherry*, stating that a trust "cannot be implied from authorities relied upon by the court." 594 F.2d at 802. The dissent focused on the jurisdictional standards announced in *Testan* and *Eastport* (decisions curiously overlooked by the *Cherry* majority) and criticized the majority's use of *Mitchell*:

The legislative scheme for settlement of Indian claims before the Indian Claims Commission was designed to provide relief for group claims as opposed to individual claims. *See Turtle Mountain Band of Chippewa Indians v. United States*, 203 Ct.Cl. 426, 490 F.2d 935, 951 (1974). We see no basis for concluding that the individuals in this case had somehow come to enjoy individual property interests in the judgment award at the time of distribution. The Distribution Act establishes no basis for such a conclusion.[14] It provides that the fund be distributed "among the *groups* of persons entitled to enrollment on the Southern Paiute Indian roll." Pub.L. No. 90–584, § 3, 82 Stat. 1147 (emphasis added). Further indication that individual property interests were not intended on behalf of all persons coming within the categories in the Distribution Act is seen in section 4 of the act. It provides that the judgment award shares payable to two groups of Southern Paiutes, the Kaibab Band and the Moapa Band, be "redeposited in the Treasury of the United States to the credit of the respective bands," for use "*in any manner* authorized by the governing body [of each band] and approved by the Secretary." *Id.* § 4 (emphasis added). Although the distributional section applicable to plaintiffs directed distribution to individuals, the right to such an individual payment, and thus a specific property right in the judgment award, was predicated upon enrollment by the Secretary. *See id.* § 5. Plaintiffs were not so enrolled.

Given the variety and complexity of acts and regulations providing for distribution of judgment awards and other funds among Indians, we intentionally avoid making sweeping statements concerning the existence or scope of constitutionally significant property interests in these funds generally. We simply hold that these particular plaintiffs did not, as a matter of law, have such property interests in this particular judgment fund.

14. It is true that some other statute or regulation could serve to indicate the existence and extent of individual property interests in the

## V.

For the reasons outlined in this opinion, the order of the district court is affirmed.

judgment fund. However, we are unable to discover other provisions which so indicate.